MAS-20030912    Commonwealth of Massachusetts    11/18/2003
guen

Case 1:03-cv-12297-RWZ    Document 1-2    Filed 11/20/2003    Page 1 of 31

03-12297-QWZ

SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

02:43 PM

## SUCV2003-04869
### Epstein v C R Bard Inc et al

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 10/15/2003 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 11/18/2003 | **Session** | BLS2 - CtRm 20 | | |
| **Origin** | 1 | **Case Type** | BD2 - Proprietary or trade secrets | | |
| **Lead Case** | | **Track** | B | | |

| | | | |
|---|---|---|---|
| **Service** | **Answer** | | **Rule12/19/20** |
| **Rule 15** | **Discovery** | | **Rule 56** |
| **Final PTC** | **Disposition** | | **Jury Trial**   Yes |

### PARTIES

**Plaintiff**
Scott M Epstein
Active 10/15/2003

**Private Counsel 548303**
Gary E Lambert
Lambert & Associates
92 State Street
Boston, MA 02109
Phone: 617-720-0091
Fax: 617-227-0313
Active 10/15/2003 Notify

**Defendant**
C R Bard Inc
Service pending 10/15/2003

**Private Counsel 201240**
Andrew Good
Silverglate & Good
83 Atlantic Avenue
Boston, MA 02110
Phone: 617-523-5933
Fax: 617-523-7554
Active 11/10/2003 Notify

**Defendant**
Futuremed Interventional Inc
Service pending 10/15/2003

**Private Counsel 558566**
Michael A Albert
Wolf Greenfield & Sacks
600 Atlantic Avenue
19th floor
Boston, MA 02210
Phone: 617-720-3500
Fax: 617-720-2441
Active 11/07/2003 Notify

**Defendant**
Crossbow Ventures Inc
Service pending 10/15/2003

\*\*\* See Attorney Information Above \*\*\*

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 10/15/2003 | 1.0 | Complaint (Business) & Jury demand |

SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

## SUCV2003-04869
### Epstein v C R Bard Inc et al

| Date | Paper | Text |
|------|-------|------|
| 10/15/2003 | | Origin 1, Type BD2, Track B. |
| 10/15/2003 | 2.0 | Civil action cover sheet filed |
| 10/17/2003 | 3.0 | Notice sent: Acceptance into Business Litigation Session Notice sent 10/17/03 |
| 11/06/2003 | 4.0 | Assented to motion for 30 days extension of time for defts  Futuremed Interventional Inc and  Crossbow Ventures Inc to   answer  to & including  December l0.2003  (w/o opposition) |
| 11/07/2003 | 5.0 | Motion of deft C R Bard, Inc to extend time for filing ANSWER or otherwise responding to complaint to & incl Dec l0, 2003  (w/o opposition) |
| 11/14/2003 | | MOTION (P#4) Allowed  (Botsford,J) Notice Sent 11/12/03 (entered 11/10/03) |
| 11/18/2003 | | Certified of petition for removal to U. S. Dist. Court of Defts. C.R. Bard, Inc., Futuremed Interventional, Inc., and Crossbow Ventures, Inc. U. S. Dist.#(03CV-12297RWZ). |
| 11/18/2003 | | Case REMOVED this date to US District Court of Massachusetts |

EVENTS

I HEREBY ATTEST AND CERTIFY ON

NOV. 19, 2003 , THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY

ASSISTANT CLERK.

COMMONWEALTH OF MASSACHUSETTS

**1**

Suffolk, SS.

SUPERIOR COURT DEPARTMENT
BUSINESS LITIGATION SESSION

```
                                          )
SCOTT M. EPSTEIN,                         )
                                          )
        Plaintiff.                        )        Civil Action No.:  03 - 4869 BLS
                                          )
v.                                        )
                                          )
C.R. BARD, INC.,                          )
FUTUREMED INTERVENTIONAL, INC., and       )
CROSSBOW VENTURES, INC.                   )
                                          )
        Defendants.                       )
                                          )
```

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

1.      This is an action involving among other causes, misappropriation of trade

secrets, unfair business practices pertaining to those trade secrets and breach of contract.

Plaintiff, Scott M. Epstein, a person skilled in the art of medical devices, invented novel

catheters and novel methods and processes to fabricate such products from materials that

were not utilized in the past applications.  Thus, Epstein has created designs that are

novel since these designs maintained a rigid proximal end, transitioning axially and

decreasing in rigidity to a very strong soft flexible radiopaque tip.  After futile attempts to

produce products that possessed the design characteristics of Epstein's designs,

Defendant C.R. Bard, Inc., negotiated an agreement with Epstein regarding purchase of

two different ureteral catheters by C.R. Bard, Inc.  After a period of time, Defendant C.R.

Bard, Inc. indicated that it was no longer interested in purchasing or licensing technology from Epstein. Subsequent to C.R. Bard Inc.'s alleged sever of relations with Epstein, it was discovered that C.R. Bard, Inc. had in fact continued selling the ureteral catheters. However, the ureteral catheters were exact copies of Epstein, reproduced by a supplier of C.R Bard, Inc. under the specifications of Epstein's design and manufacturing methods. Therefore, Epstein brings the instant action as a result of the injury caused as described in the following paragraphs.

## PARTIES

2.      Plaintiff, Scott M. Epstein ("Epstein"), an individual, is a resident of Boston, Suffolk County, Commonwealth of Massachusetts. Epstein was at all relevant times the sole proprietor of SME Design Technology, Inc., ("SME"). Epstein is presently the sole proprietor of Medical Device Labs, ("MDL") based in Massachusetts.

3.      Defendant C.R. Bard ("C.R. Bard"), is a New Jersey Corporation with its principal offices in Murray Hill, New Jersey. Bard Urological Division, ("BUD"), is a division of C.R. Bard with offices and manufacturing facilities in Covington, Georgia. Bard Medical Division ("BMD"), is a division of C.R. Bard with offices and manufacturing facilities in Covington, Georgia. C.R. Bard, Inc. has a regular course of business in the Commonwealth of Massachusetts.

4.      Defendant FutureMed Interventional, Inc. ("FutureMed"), is a Texas corporation with its principal offices in Athens, Texas. FutureMed sells its products through C.R. Bard, Inc. Upon information and belief, FutureMed has a regular course of business in the Commonwealth of Massachusetts.

2

5.      Defendant CrossBow Ventures is a Florida corporation with its principal offices in West Palm Beach, Florida. Upon information and belief, CrossBow Ventures has a regular course of business in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to M.G.L. c. 93 § 12 M.G.L. c. 93A § 2 and § 11 and M.G.L. c. 223A Sections 3(a) through 3(d) and other statutes, since, upon information and belief, the acts took place in Massachusetts, Defendants conducted business in Massachusetts, and Plaintiff resides in Massachusetts.

7.      Venue is proper in Suffolk Superior Court pursuant to M.G.L. c. 93 § 42 and § 42A, because Plaintiff seeks injunctive relief to protect his trade secrets.

## FACTS COMMON TO ALL COUNTS

8.      Epstein has approximately twenty years of experience in the medical device industry and continues to invent and develop advanced medical devices. His knowledge, experience and developments are well-known by those skilled in the art of medical devices.

9.      From approximately 1989 to 1998, Epstein operated SME, a self-funded Research and Development ("R&D") business in Holliston, Massachusetts. The business was later incorporated into MDL. Epstein focused on the design and manufacture of medical devices, particularly catheters and methods and processes to fabricate such products primarily from Thermoplastic Polyurethane Elastomers (known as TPU / TPE), Hydrophilic Polymers (known as Hydrogels), and Radiation Resistant Materials, which were a specialty.

3

10.    Epstein contributed to the creation of high performance products based on novel, cost effective manufacturing methods. Products manufactured in this manner could be designed to maintain a rigid proximal end transitioning axially and decreasing in rigidity to a very strong soft flexible tip.  These transitions exhibited superior mechanical characteristics and are generally referred to as "segmenting" and "lamination" technology.

11.    Epstein specified and was expert with Tecoflex Polyurethane Thermoplastic Elastomer, manufactured by Thermedics, Inc., of Woburn, Massachusetts, filled with Barium Sulfate (BaSO4) and/or Tungsten powders. Epstein extruded Tecoflex Polyurethane filled with concentrations of BaSO4 and/or Tungsten very accurately. Epstein's capabilities allowed the production of catheters that exceeded competitive product column strength, radiopacity and tip strength.

12.    Epstein gained greater credibility when industry leaders became interested in what Epstein had accomplished. This included licensing technology to Johnson and Johnson Interventional Systems of Warren, New Jersey, developing polyurethane devices that were previously made only from natural latex rubber for E-Z-EM of Westbury, New York, and the development of lead free thermoplastic elastomeric radiation shielding.

13.    Epstein's intellectual property (design, material, process specifications and technology) is clearly proprietary and therefore of great value in the industry. Epstein handled and controlled his technology as trade secrets and in a confidential manner at all times. Epstein required confidentiality with all parties involved and considered patenting product applications, once these were positioned for launching.  Otherwise, it was

4

unlikely patent protection would be pursued because not disclosing Epstein's technology was the best overall protection at the time.

14.    BUD was aware of this strategy and even discussed possible future licensing with Epstein. Counsel for BUD discussed patent strategies and assignment from Epstein. BUD did request that Epstein sign BUD's version of a sophisticated and biased Distribution and Supply Agreement. However, drafting of a patent application and signing the BUD Distribution Agreement never occurred.

15.    On or about December 23, 1994, Epstein and C.R. Bard, Inc. entered into a confidential information agreement pertaining to the manufacture and development of hydrophilic coatings.

16.    On or about January 27, 1995, Epstein and BUD entered into a confidential information agreement pertaining to stents and catheters.

17.    On or about March 24, 1995, Epstein was instructed by BUD in writing to begin development efforts of a hydrophilic polymer drainage stent.

18.    On or about November 26, 1996, Epstein and Defendant BUD agreed that the information disclosed pursuant to the Confidential Information Agreement of January 1995, would be shared with Bard Cardiology Group ("BCG").

19.    On or about December 12, 1996, Bard Medical Division reported the conclusion of testing of samples of the Bard Open Tip Ureteral Catheter invented and produced by Epstein.

20.    On or about January 9, 1997, Bard Medical Division reported the conclusion of testing of samples of the Bard Tiger Tail Ureteral Catheter manufactured by Epstein.

5

21.    On or about January 31, 1997, Epstein and BUD entered into a Confidential Information Agreement pertaining to stents and catheters.

22.    In 1995, Xavier Sarabia, a Project Engineer working for BUD in Covington, Georgia, contacted Epstein based on a referral. This initial interest focused on Epstein's Hydrogel polymer and process technologies that could be implemented into BUD product lines. A relationship quickly grew wherein Epstein was reimbursed for the time and materials expended to produce prototype Ureteral Stents. This lead to Epstein coating BUD Ureteral Open Tip Catheters made of Pebax.

23.    Thus, during 1997 BUD extended an invitation to Epstein to visit its facilities in Covington, Georgia. Accompanied by Duane Dunn, President of Dunn Industries, Inc. of Manchester, New Hampshire, Epstein toured BUD facilities and was introduced to the BUD Director of Engineering and staff, Urology Marketing and sales managers, and related personnel. This included a meeting with Howard Klymas, Product manger for Urology Products and Rance Winkler, a Project Manger for Urology Products. During a presentation to these people, which included Epstein's drawings and samples, exceptional interest was given by Howard Klymas and Rance Winkler to a multi-durometer, Soft Tip SME prototype catheter. An exceptional interest was exhibited by Mr. Klymas when a demonstration of tip strength was conducted and X-ray films of a SME catheter were compared to a competitive product.

24.    Duane Dunn had an opportunity to review and assess Epstein's technology. Mr. Dunn was able to conclude that based upon Epstein's accomplishments, Epstein had discovered a novel process for the process and manufacture of ureteral

6

catheters and that Epstein had achieved results that BUD previously did not.    (See Affidavit of Duane Dunn attached hereto as Exhibit "A").

25.    Mr. Klymas indicated that Epstein had accomplished what BUD had utterly failed to achieve. BUD apparently had great difficulty manufacturing a Soft Tip catheter that yielded reliable distal tip strength at its joint. Epstein had a process and specified materials that exceeded both BUD specifications and market requirements. Furthermore, Epstein was able to deliver a Soft Tip catheter to BUD for an acceptable cost that exceeded BUD margin requirements. This represented Epstein's capability to overcome another difficulty BUD apparently encountered with attempts to develop a similar version. As such, Epstein and BUD negotiated and reduced to writing a $3.50 per catheter transfer price for a minimum commitment of 50,000 units over eighteen months shipped non-sterile in bulk.

26.    Epstein scaled up immediately to meet demand, supplying BUD two different Ureteral Catheters, available in three sizes and several configurations for diagnostic applications. These catheters were based on Epstein's material and process technology which was shared in confidence with BUD Engineering, Quality and Regulatory staff in order to achieve and meet regulatory guidelines. Section 510(k) of the Food, Drug and Cosmetic Act requires those device manufacturers who must register to notify the FDA, at least 90 days in advance, of their intent to market a medical device. This is known as Pre-Market Notification – also called PMN or 510(k).  It allows the FDA to determine whether the device is equivalent to a device already placed into one of the three classification categories.  Thus, "new" devices (not in commercial distribution prior to May 28, 1976) that have not been classified can be properly identified.

7

Specifically, medical device manufacturers are required to submit a pre market notification if they intend to introduce a device into commercial distribution for the first time or reintroduce a device that will be significantly changed or modified to the extent that its safety or effectiveness could be affected. Such change or modification could relate to the design, material, chemical composition, energy source, manufacturing process, or intended use. (The FDA Official Website visited April 25, 2003) <http://fda.gov/cdrh/510k.html>.

27.     Instead, BUD filed Epstein's data and related test results internally utilizing the so-called "Grandfather" status for a previously approved 510k device of similar description.

28.     Additionally, BUD was reluctant to move forward with the marketing of BUD's own Soft Tip catheter after receiving FDA approval, particularly since the initial BUD Soft Tip Ureteral Catheter exhibited poor, unreliable tip strength, unsatisfactory column strength and no significant advantages over competitive product.

29.     Only after BUD found out about Epstein's Soft Tip Catheter did BUD decide to aggressively move forward with marketing such a catheter.

30.     BUD never notified the FDA about changes between the BUD Soft Tip catheter and Epstein's Soft Tip catheter. BUD should have filed a Master Design History for its internal records. Such a file should include testing, specifications, change orders, and other documents crucial to the diligence required to insure that the device is safe and effective.

31.     BUD failed to resubmit its 510k #950300, which was issued in April 1995 to substantiate additional claims like radiopacity and tip strength enhancements of

Epstein's Catheter although BUD sales representatives regularly make claims regarding these features. Promoting Epstein's contribution and deviations from the BUD 510k #950300, constitute the marketing of an adulterated product and would be grounds for an investigation by the FDA.

32.    The domestic market for the Soft Tip Ureteral Catheters BUD distributed (BUD trademark "Tigertail") for Epstein was estimated to be approximately 300,000 units per year. BUD planned to sell each device for $10 to $12. Upon information and belief, at the same relevant time, Boston Scientific Corporation, Microvasive Division of Natick, Massachusetts sold competitive device for an estimated $20 each, and Cook Urological, Inc., of Bloomington, Indiana, may have sold their competitive device for $12 per unit.

33.    Epstein's technology provided BUD an exceptional advantage in the market place with product and technology that could be sold at competitive pricing while exceeding acceptable profit margins.

34.    Epstein began to expand marketing efforts and entered into a written agreement with Cook Urology to provide a Ureteral Stent based on the same technology that was used to design and produce the Ureteral Catheter Epstein provided to BUD.

35.    The Ureteral Stent's domestic market exceeded one million units and provided Cook Urology an exceptional opportunity to aggressively take over market share which Boston Scientific Corporation controlled an estimated 50% of. Based upon the agreement with Cook and Boston Scientific's desire to have several meetings, it became clear to Epstein that he had developed a unique and novel technology.

9

36.    At about this same time, Epstein decided to scale back operations due to a lack of resources that were required to run the business. Epstein attempted to sell or license its technology to prospective customers. BUD was advised in a timely manner about this decision. Epstein then attempted to negotiate a transfer of technology to BUD through licensing.

37.    Ultimately, BUD indicated that it was not interested in purchasing or licensing Epstein's technology. In a telephone call between Epstein and Gary Teague, Urology Product Manager, Teague indicated that BUD would discontinue the Ureteral Catheter product line that Epstein supplied to BUD.

38.    Gary Teague and or BUD caused the disclosure of Epstein's technology to a third party, FutureMed International, Inc. ("FutureMed"), of Athens, Texas, which in turn supplied Soft Tip catheters to BUD.

39.    In an oral statement to Epstein, Xavier Sarabia, then a Project Engineer for BUD, suggested that Gary Teague had an interest in FutureMed and provided them with the specifications in order to supply BUD with the Soft Tip Tigertail catheter, which Epstein had designed, developed and supplied to BUD in the past.

40.    BUD should not have allowed this relationship with out disclosure to Epstein. BUD has ethical guidance requirements for all employees. BUD's actions or omissions have professionally violated its own ethical guidance requirements.

41.    When visiting FutureMed facilities in early 2001, Bill Appling, Director of Engineering for Angiodynamics of Queensbury, New York, inquired of FutureMed principals regarding a product that was held out to be a BUD product, but was in fact an SME product. Appling received an evasive, suspiciously cold reply.  Appling has been

10

aware of SME technology since about 1994. Due to confidentiality, Appling was reluctant to discuss the matter any further.

42.    FutureMed is owned by a parent company, CrossBow Ventures, Northbridge Center, 515 Flagner Drive, Suite 1200, West Palm Beach, Florida. FutureMed was notified, however, no response was ever received by Epstein.

43.    During 2001, Tyco International Ltd. ("Tyco"), was considering acquiring BUD. Tyco was also notified by Epstein. Although a response was received from Tyco, no further contact was attempted under the circumstances.

44.    Subsequent to Howard Klymas being promoted and transferred, Gary Teague had several meeting with Epstein to discuss additional products and project ideas. This included a guidewire that Epstein designed, based on the same or similar technology that produced the Soft Tip catheter. Within the scope of Epstein / BUD confidentiality, there was no reason not to discuss this opportunity in an attempt to rally BUD support. Additionally, Epstein had previously communicated and proposed similar opportunities to Howard Klymas and C.R. Bard Engineer Rich Elton about similar guidewire design and developments.

45.    Epstein had also previously been working with Bard Radiology Engineer Rob Farnum especially on guidewire and micro-catheter developments. All these efforts were conducted in confidentiality and would have provided BUD staff opportunities to view and inspect Epstein's concepts and prototypes.

46.    BUD never discontinued the Ureteral Catheter product line Epstein supplied to BUD as was suggested by BUD. Instead of purchasing Epstein's technology, BUD puts on display the Tigertail SoftTip catheter that Epstein developed at Medical

11

shows and conferences and promotes the Soft Tip Catheter in corporate literature, as BUD's own.

47.    BUD is promoting the Soft Tip catheter technology that Epstein developed and is making performance claims while BUD's FDA approval granted in April 27, 1995 for FDA 510(k) Number 950300 is for catheters of significantly lesser substance than the Epstein Catheter. SME performance claims are not approved and or detailed in the BUD 510(k) claims and technically cannot lawfully be made orally or otherwise. For instance, BUD and C.R. Bard, Inc. Inlay Stent 510(k) (K# 022447) references (K# 983498) but not any reference to the BUD TigerTail Soft Tip Ureteral Catheter, which is orange, or 510(k) (K# 950300) as a predicate reference with respect to the color orange. BUD 510(k) (K# 950300) approves a gray colorant and was never updated or resubmitted for subsequent approval including an orange specification. This would be required to support the new Pusher Catheter, which appears just like the Tigertail Ureteral Catheter supplied with the Inlay Stent. To the best of his knowledge, Epstein was originally the first to use orange in Urology Products, which utilized a unique process to compound colorant into the plastic in order to achieve superior biocompatibility and mechanical characteristics. This was not captured in the BUD 510(k) # 950300. BUD 510(k) (K# 022447), which clearly identifies orange as a color and a distal radiopaque marker lacks the only reference (BUD 510(k) # 950300) to similar BUD product required for a predicate reference.

48.    Epstein's technology that included a significantly more radiopaque, stronger and flexible distal tip is not established within the scope of the BUD 510(k) #950300 claims.

12

49.     These above-referenced characteristics greatly enhance the value of the Soft Tip catheter technology. Epstein clearly provided this technology to BUD, as described in the paragraphs above BUD did not have previously. This is evidenced by BUD's 510k claims and the testimony of key BUD employees.

50.     In addition to holding out for sale products possessing Epstein's trade secrets, BUD conveyed Epstein's specifications and corresponding proprietary information to FutureMed, which then and now supplies BUD with a similar product Epstein supplied BUD. This transfer of information occurred without the express permission of Epstein. Epstein was never consulted with or offered the opportunity to negotiate the disclosure of Epstein's proprietary information to third parties such as FutureMed. (See Comparison Photos of FutureMed Product and SME Design Product manufactured for BUD attached hereto as Exhibit "B").

51.     Subsequently, BUD was advised by Epstein that BUD was conducting business in an unauthorized manner. Several letters were written advising among others, Corporate Board Members, Engineering, Sales, Marketing and corporate legal staff that they were using Epstein's technology and proprietary information without permission.

52.     After corresponding with legal counsel for BUD, Epstein has seen BUD's position regarding Epstein's technology undergo many changes. BUD has claimed that BUD owned the technology that Epstein used to produce the Ureteral Catheter which Epstein provided BUD. BUD has also claimed that it might have overlooked this issue and would discuss this matter after BUD was supplied with affidavits from former key BUD employees involved in this matter.

13

53. Legal counsel for BUD only interviewed Howard Klymas by telephone. In a discussion between Epstein and Mr. Klymas after this interview, it was the opinion of Mr. Klymas that BUD's legal counsel attempted to manipulate his statements and BUD's legal counsel were angry that they could not acquire testimony from Mr. Klymas that they would have liked. Mr. Klymas stressed during the interview the manner in which BUD employees were expected to conduct themselves and that the interview and handling of Epstein's trade secrets were counter to BUD policies. (See Affidavit of Howard Klymas attached hereto as Exhibit "C").

54. Mr. Klymas indicated to BUD during this interview that his testimony would not change, or be manipulated into a statement contrary to the truth. Mr. Klymas indicated that during his interview, he underscored that as the Urology Product Manger, he was crystal clear that the Ureteral Catheters SME supplied to BUD were based on Epstein's technology and there was no agreement other than to supply 50,000 units for an agreed unit cost.

55. BUD never discussed this issue further with Epstein after their interview with Mr. Klymas. From thereon, BUD avoided all further discussions with Epstein.

56. Gary Teague, along with two other C.R. Bard, Inc. employees, was granted U.S. Patent No. 6,245,030 that was issued on June 12, 2001. One contributor, Rich Elton, an Engineer at C.R. Bard's, Glens Falls, New York facility met with Epstein and also discussed Epstein's technology on several occasions.

57. Rich Elton was involved with the Catheters Epstein supplied to BUD. A separate confidentiality agreement between Epstein and C.R. Bard's Glens Falls, New York facility was completed.

14

58.    Based on what was disclosed in the meetings between Epstein and BUD, especially meetings in which Gary Teague and Rich Elton were present, Teague and Elton were able to compose the above-referenced patent application through their knowledge of Epstein's technology.

59.    On or about December 30, 2002, Epstein notified the FDA via e-mail that he suspected C.R. Bard and BUD were misappropriating his trade secrets. Bud was misappropriating and selling an adulterated product without a proper 510k.

60.    In April 2003, Epstein attended the American Urology Association ("AUA") meeting in Chicago, Illinois. While in attendance at the AUA Congress, he was able to make observations of various vendor displays. At the BUD booth, he observed that an orange catheter with a black tip was being exhibited. He then inquired about this device with a BUD representative. Upon indicating that the device looked a lot like the "Tigertail" Catheter, the Bard representative corrected him indicating that although the device exhibited similar performance as the Tigertail Ureteral Catheter, this device was a Pusher Catheter available with the Inlay Ureteral Stent kit. The Pusher Catheter appeared to very much like the Tigertail Catheter. (See Affidavit of Scott Epstein attached hereto as Exhibit "D").

61.    Epstein has come into possession of a BUD Ureteral Tigertail Catheter for the purposes of analysis and comparison. (See Photos of Packaged BUD Ureteral Tigertail Catheter attached hereto as Exhibits "E", "F", "G" and "H").

62.    Cook Urological ("Cook") has expressed an interest in Epstein's licensing and producing medical devices based upon his technology.

15

63.     As a direct and proximate result of the Defendants' action, Plaintiff has been denied the position as the principal competitors with a superior technology for medical devices in the field of urology, with a value yet to be determined.

64.     As a direct and proximate result of Defendants' actions, Plaintiff has been denied the position as principal competitor with a superior technology for other and commercial contracts.

**COUNT I**
**BREACH OF CONTRACT**
**(Epstein vs. C.R. Bard, Inc.)**

65.     The Plaintiff realleges the allegations contained in paragraphs 1-64 and incorporates them herein.

66.     As part of the ongoing contractual relationship established by their course of conduct over several years, Epstein endeavored to invent, design and develop Medical Devices, especially Catheters and methods and processes to fabricate such products for the benefit and use of the C.R. Bard, Inc., among others.

67.     By the aforementioned actions, Defendants have breached their contract with the Epstein violating, among others, U.C.C. Section 1-203 which provides; "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."

68.     The Defendants' failure to keep Epstein's trade secrets confidential and Defendants' divulging said technology, intellectual property and trade secrets to third parties constitutes a breach of contract.

69.     Said acts were done willfully and knowingly by the Defendants.

16

70.    As a result of the breach of contract by the Defendants, Plaintiff has been damaged monetarily, plus interest and costs.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Epstein vs. C.R. Bard, Inc.)

71.    The Plaintiff realleges the allegations contained in paragraphs 1-70 and incorporates them herein.

72.    At certain relevant times, Plaintiff had valid contractual relationships with C.R. Bard, BMD and BUD, among others.

73.    Defendants have with improper motive and/or by improper means breached the agreements and have attempted to use information gained from Epstein to contract directly with the same companies and entities that Epstein would have rightfully made contractual relationships with.

74.    Defendants' interference was intentional and improperly motivated.

75.    As a direct and proximate result of Defendants' acts of tortious interference and participation, Plaintiff has suffered substantial and irreparable harm as well as damages.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
### (Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)

76.    The Plaintiff repeats and realleges paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.    Upon information and belief, the Defendants have obtained Plaintiff's trade secrets pursuant to their meetings and contractual relationships with Plaintiff.

17

78.    Defendants have used Plaintiff's trade secrets for the benefit of themselves and unknown others, and such use constitutes misappropriation of Plaintiff's trade secrets.

79.    Plaintiff has taken reasonable steps to protect their trade secrets by instituting internal company policies and procedures regulating the access to, designation of, and dissemination of its proprietary and confidential information, and by other means.

80.    Plaintiff has the right to exclusive ownership, enjoyment, and use of its trade secrets.

81.    The Defendant continues to irreparably harm Plaintiff by such misappropriation of trade secrets.

82.    Plaintiff has suffered direct and consequential harm as a result of the defendants' misappropriation of Plaintiff's trade secrets, and are entitled to damages therefore.

**COUNT IV**
**CONVERSION**
**(Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)**

83.    Plaintiff repeats and realleges paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.    Defendants have tortiously and unjustifiably converted Plaintiff's technology, trade secrets and intellectual property for their own use.

18

85.    As a direct and proximate result of Defendants' conversion, Plaintiff has suffered and continues to suffer damages and irreparable injury.

**COUNT V**
**UNJUST ENRICHMENT**
**(Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)**

86.    Plaintiff repeats and realleges paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.    Defendants have been unjustly enriched by inter alia using Plaintiff's technology, trade secrets and intellectual property.

88.    As a direct and proximate result of such unjust enrichment, Plaintiff has incurred damages to an extent not yet ascertained.

**COUNT VI**
**MISREPRESENTATION**
**(Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures )**

89.    Plaintiff repeats and realleges paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90.    Defendants made representations as to proper notification to the Food and Drug Administration pertaining to the BUD Soft Tip Catheter.

91.    Defendants made representations as to filing a Master Design History for their internal records.

92.    Defendants made representations as to resubmitting their 510k application to the FDA to substantiate additional claims like radiopacity and tip strength.

93.    The representations made by Defendants were false.

19

94.    Defendants knew that the representations were false when made.

95.    Defendants made the representations with the intent to defraud the Plaintiff.

96.    Defendants made the representations for the purposes of inducing Plaintiff to rely upon them and to act or to refrain from acting in reliance thereon.

97.    Plaintiff was unaware of the falsity of the representations.

98.    Plaintiff acted in reliance upon the truth of the representations and was justified in relying upon the representations.

99.    As a direct and proximate result of such representations, Plaintiff has incurred damages to an extent not yet ascertained.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**
**(Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)**

100.    Plaintiff repeats and realleges paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.    Defendants made representations to Plaintiff as to proper notification to the Food and Drug Administration pertaining to the BUD Soft Tip Catheter.

102.    Defendants made representations to Plaintiff as to filing a Master Design History for their internal records.

20

103.    Defendants made representations to Plaintiff as to resubmitting their 510k to the FDA to substantiate additional claims like radiopacity and tip strength.

104.    The representations of Defendants were untrue.

105.    Defendants made the representations to Plaintiff without any reasonable grounds for believing it to be true.

106.    The representations were made by Defendants with the intent to induce Plaintiff to rely upon them.

107.    Plaintiff was unaware of the falsity of the representations.

108.    Plaintiff then acted in reliance upon the truth of the representation and was justified in relying upon the representation.

109.    As a direct and proximate result of the reliance upon the truth of the representation, the Plaintiff sustained damages yet to be calculated.

## COUNT VIII
## FRAUDULENT CONCEALMENT
### (Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)

110.    Plaintiff repeats and realleges paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111.    Defendants concealed and suppressed material facts as to notification to the Food and Drug Administration pertaining to the BUD Soft Tip Catheter.

21

112. Defendants concealed and suppressed material facts as to filing a Master Design History for their internal records.

113. Defendants concealed and suppressed material facts as to their resubmitting the 510k to the FDA to substantiate additional claims like radiopacity and tip strength.

114. Defendants concealed and suppressed material facts as to the dissemination to third parties of Plaintiff's technology, intellectual property and trade secrets.

115. Defendants concealed and suppressed material facts as to the use of the Plaintiff's technology, intellectual property and trade secrets without express permission of Plaintiff.

116. Defendants concealed and suppressed material facts as to the use of the Plaintiff's technology, intellectual property and trade secrets to apply for a Patent.

117. Defendants were under a duty to disclose the material facts to the Plaintiff.

118. Defendants intentionally concealed and suppressed the material facts with the intent to defraud the Plaintiff.

119. Plaintiff was unaware of the facts and would not have acted if he had known of the concealed and suppressed facts.

22

120.    As a direct and proximate result of such fraudulent concealment, Plaintiff has incurred damages to an extent not yet ascertained.

**COUNT IX**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**
**DEALING**
**(Epstein vs. C.R. Bard, Inc.)**

121.    Plaintiff repeats and realleges paragraphs 1 through 120 of this Complaint as if fully set forth herein.

122.    Defendants were under a duty to contract with Plaintiff under an implied covenant of good faith and fair dealing.

123.    Defendants breached the implied covenant of good faith and fair dealing with Plaintiff when it deprived Plaintiff of the fruits of his contracts.

124.    Defendants breached the implied covenant of good faith and fair dealing by the dissemination to third parties of Plaintiff's technology, intellectual property and trade secrets.

125.    As a direct and proximate result of such breach of the implied covenant of good faith and fair dealing, Plaintiff has incurred damages to an extent not yet ascertained.

**COUNT X**
**VIOLATION OF M.G.L. CH. 93A § 2 and § 11**
**(Epstein vs. C.R. Bard, Inc., FutureMed and CrossBow Ventures)**

126.    Plaintiff repeats and realleges paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    At all relevant times hereto Defendants were engaged in trade or commerce with Plaintiff in the Commonwealth of Massachusetts.

128.    The acts of Defendants herein were performed willfully and knowingly.

23

129.    The acts of Defendants complained of herein constitute unfair or deceptive acts or practices within the meaning of G.L. c. 93A, Sections 2 and 11.

130.    Wherefore Plaintiff requests this Court to enter a judgment for Plaintiff against the Defendants, award treble damages to Plaintiff, award interest from the dates that Plaintiff incured expenses, and award costs and attorneys' fees to the Plaintiff.

## INJUNCTIVE RELIEF

131.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 130 by reference.

132.    Based upon the foregoing information, Plaintiff has suffered and will continue to suffer irreparable harm and irreparable damages unless Plaintiff is granted injunctive relief by this Honorable Court.

133.    If Plaintiff is unable to stop the proliferation of its confidential information and further infringement if his intellectual property, he will suffer irreparable damages. For this harm and damage, Plaintiff has no adequate remedy at law.  These damages are continuing, and to a large degree will be incalculable.

134.    Plaintiff therefore requests the Court to enter an injunction enjoining Defendants, their agents, servants and employees, and those acting in concert with them from the following:

135.    Stop the design, manufacture, sale, distribution and licensing of the Defendants' products which have been designed, developed and produced based on the Plaintiff's technology, trade secrets and intellectual property.

136.    Plaintiff is entitled to injunctive relief restraining and enjoining the defendants from taking, receiving, concealing, assigning, transferring, copying or

24

otherwise using or disposing of Plaintiff's technology, trade secrets and intellectual property.

## **REQUEST FOR RELIEF**

Accordingly, Plaintiff respectfully requests that this Court:

1.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' breach of contract.

2.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' tortious interference with Plaintiff's contractual relationships.

3.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' conveyance, publication and misappropriation of Plaintiff's trade secrets.

4.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' conversion of the Plaintiff's property.

5.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' unjust enrichment.

6.     Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' misrepresentations.

25

7.    Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' negligent misrepresentations.

8.    Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' fraudulent concealment.

9.    Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' unfair and deceptive trade practices.

10.    Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' breach of the implied covenant of good faith and fair dealing.

11.    Award Plaintiff monetary damages, in an amount to be proven at trial, for the economic injury they have sustained as a consequence of Defendants' unfair and deceptive trade practices in violation of M.G.L. c. 93A sec. 11.

12.    Award Plaintiff treble damages, pursuant to M.G.L. c. 93A sec. 11, for Defendants' willful or knowing conduct constituting unfair and deceptive trade practices;

13.    Award Plaintiff double damages, pursuant to M.G.L. c 93 sec. 42 as to Plaintiff's lost profits, for Defendants' misappropriation of Plaintiff's tangible or electronically kept or stored trade secrets.

14.    Enter an injunction against the Defendants to stop the irreparable harm being suffered by the Plaintiff.

15.    Award Plaintiff his attorney's fees incurred in connection with this action.

26

16.    Award such other relief to Plaintiff as this Honorable Court deems fair and

just.

## JURY DEMAND

## THE PLAINTIFF DEMANDS A TRIAL BY JURY

. HEREBY ATTEST AND CERTIFY ON

NOV. 19, 2003, THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

    MICHAEL JOSEPH DONOVAN
    CLERK / MAGISTRATE
    SUFFOLK SUPERIOR CIVIL COURT
    DEPARTMENT OF THE TRIAL COURT

BY.

    ASSISTANT CLERK.

Respectfully submitted,
Scott Epstein, Plaintiff,
By his Attorneys,

Gary E. Lambert, Esq. BBO# 548303
LAMBERT & ASSOCIATES
92 State Street, Suite 200
Boston, MA 02109
617-720-0091

DATED: October 14, 2003.

27

## VERIFICATION OF COMPLAINT

I, Scott M. Epstein, do hereby declare that I have read the foregoing Verified Complaint and know the contents thereof. The allegations contained therein are true to my knowledge except to those matters that are alleged on information and belief; as to those matters, I believe them to be true. I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on this 30th day of September, 2003.

_____
Scott M. Epstein, Plaintiff

28

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the Plaintiffs' Complaint and Jury Demand was delivered on October 15, 2003, VIA Hand Delivery to:

1.           Civil Clerk's Office
                Suffolk Superior Court
                90 Devonshire Street
                Boston, MA 02109

Signed Under The Penalties of Perjury,

Gary E. Lambert, Esq.

29