UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT M. EPSTEIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 03 CV 12297 (RWZ) |
| ) | |
| C.R. BARD, INC., ) | |
| FUTUREMED INTERVENTIONAL, INC., ) | |
| and CROSSBOW VENTURES, INC. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT C.R. BARD, INC.'S
MOTION TO DISMISS COUNTS II, III, IV, V, VI, VII, VIII
AND X OF PLAINTIFF'S COMPLAINT AND REQUEST FOR
ORAL ARGUMENT UNDER LOCAL RULE 7.1 D.**

## I.    **INTRODUCTION**

In an broad brush manner, Defendant C.R. Bard, Inc. (referred to hereafter as "Bard") has moved to dismiss 8 of 10 Counts of Plaintiff's (referred to hereafter as "Mr. Epstein") Complaint, arguing that Counts II, III, IV, V, VI, VII, VIII and X fail to state a claim upon which relief can be granted and, therefore, should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In moving, Bard specifically argues: 1) that each of Counts II–VIII and X are time barred; 2) that the fraud based claims lack particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure; 3) that Counts II and X of Mr. Epstein's Complaint lack necessary elements; and 4) that Counts VI, VII and VIII are pre-empted and, therefore, this Court lacks jurisdiction over the subject matter and therefore the counts should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Further, flying in the face of the fact intensive scope of the Complaint, Bard consistently asserts that Mr. Epstein pled **no facts** to support the allegations in the numerous counts of the Complaint.

Further and of highest import, as discussed in Section II.B. below, Counsel for Bard was found to have admitted that Bard had absolutely no property rights in Mr. Epstein's intellectual property, proprietary documentation and processes used to manufacture catheters in conformance with the specifications required by Bard.  This admission is perfectly consistent with the multiple affidavits, including some from former Bard employees, filed by Mr. Epstein as attachments to the Complaint, which clearly illustrate Bard's repeated failure to develop any method to manufacture catheters within Bard's required specification.  Thus, Bard's own Counsel has admitted that Bard had absolutely no right to transfer Mr. Epstein's trade secrets to Defendants Futuremed Interventional, Inc. (referred to hereafter as "Futuremed") and Crossbow Ventures,

1

Inc. (referred to hereafter as "Crossbow"). Bard's actions qualify as particularly onerous in light of the industry wide failure to attain the catheter specifications achieved by Mr. Epstein and required by Bard. Further, when evaluating the industry potential for a party such as Mr. Epstein who achieved this milestone, Bard's actions are absolutely catastrophic.

Finally, for the reasons set forth herein, Mr. Epstein opposes Bard's motion on all bases and since: 1) each count of Mr. Epstein's Complaint is well within the applicable statute of limitations; 2) the fraud based claims have been pled with the requisite particularity necessary to prosecute them in the Court; 3) Mr. Epstein's Count II, Tortious Interference With Contractual Relationships, has been pled with the requisite particularity; 4) Count X contains all required elements to meet with the requirements of Mass. Gen. L. Ch. 93A §§ 2 And 11 As Pled; and 5) Counts VI, VII and VIII are clearly not pre-empted, Bard's Motion to Dismiss should be denied and Mr. Epstein's complaint should stand as filed.

## II.    ARGUMENT

### A.    Relevant 12(b)(6) Standards

As the Federal Rules and the First Circuit vehemently mandate, the moving party in a motion to dismiss faces an extremely heavy burden and a high threshold of scrutiny. In deciding a 12(b)(6) motion, the court will "treat all allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff." *Rumford Pharmacy, Inc. v. East Providence*, 970 F.2d 996, 997 (1st Cir. 1992). A court should not dismiss a suit on the pleadings alone "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove

no set of facts in support of his claim which would entitle him to relief." Fed. R. Civ. P. 12(b)(6),

28 U.S.C.A. §1447, note 561.

**B.     Each Count Of Mr. Epstein's Complaint Is Well Within The <u>Applicable</u>**
**<u>Statute Of Limitations.</u>**

In moving for dismissal of Counts II, III, IV, V, VI, VII, VIII and X, Bard asserts that

each of these individual counts have been time barred.   Quite to the contrary, as clearly

illustrated in the original Complaint, the supporting Affidavits of Mr. Epstein, Howard Klymas

and Duane Dunn, attached to the original Complaint (referred to hereafter as "the attached

Affidavits") and the Supplemental Affidavit of Mr. Epstein attached to this Opposition (referred

to hereafter as "the Supplemental Affidavit"), each Count in the Complaint has been brought in a

timely manner.   Moreover, as the factual basis established by Mr. Epstein illustrates, until very

recently, Mr. Epstein was not positive of the depth and severity of the actions of the several

Defendants, including Bard.   As shown above, a party moving for dismissal of a complaint

endures a very high level of scrutiny.   Further, Courts are quick to recognize the inequity in

granting dismissal for statute of limitations violations without definitively establishing that

knowledge of the harm done should be imputed plaintiff as follows:

> This court has recognized the unfairness of a rule that holds that the statute of
> limitations has run even before a plaintiff knew or reasonably should have known
> that she may have been harmed by the conduct of another. We, therefore, have
> developed (in the absence of a governing statute) a discovery rule for the purpose
> of determining when a cause of action accrues, and thus when the statute of
> limitations starts to run. This rule prescribes as crucial the date when a plaintiff
> discovers, or any earlier date when she should reasonably have discovered, that
> she has been harmed or may have been harmed by the defendant's conduct.

*Bowen v. Eli Lilly & Co.*, 557 N.E.2d 739, 740-41 (Mass. 1990).  Thus, in addition to the high

threshold faced by Bard in moving for dismissal, alleging dismissal upon grounds of a statute of

limitations violation represents an even greater burden.   As the several paragraphs of the

3

Complaint, the attached Affidavits and the Supplemental Affidavit clearly illustrate, Mr. Epstein

vigilantly pursued his cause from his initial detection of possible foul play until the October 15,

2003 filing date and thus all counts of this action comport with the applicable statutes of

limitation.

From the first indicia of foul play, despite Mr. Epstein's best efforts to acquire the

requisite knowledge to concretely establish his causes of action, Bard (and the several

Defendants) wholly failed to answer Mr. Epstein's inquiries. (See the Supplemental Affidavit of

Epstein, ¶ 7-29).   In fact, upon first contact by Mr. Epstein by letter dated October 10, 1999,

Bard responded with a letter on November 10, 1999 and seemed intent on initiating a dialogue.

(See the Supplemental Affidavit of Epstein, ¶ 7.) As the alleged negotiations continued, Bard's

Counsel asserted that Bard would come forward with affidavits to negate Mr. Epstein's

assertions. Yet, despite these retorts, Bard entirely failed to forward any affidavits or answer any

inquiries whatsoever. (See the Supplemental Affidavit of Epstein, ¶ 7-29).   As such, Bard's

efforts only qualified as feigned compliance as over the ensuing years as Bard wholly refused to

answer any of Mr. Epstein's questions.

However, in reviewing the November 10, 1999 correspondence sent by then Attorney for

Bard, M. Banks Neil, a damning admission by Bard has been revealed to Mr. Epstein. (See the

Supplemental Affidavit of Epstein, ¶ 7.) In response to Mr. Epstein's questions, Attorney Neil

responded by asserting that **only** the final physical product specifications belonged to Bard and

further admitted that **"it is SME's technology and processes used to manufacture a product

in conformance with these specifications that may be proprietary to SME."** (See the

Supplemental Affidavit, ¶ 7; See also Bard's November 11, 1999 Response to Mr. Epstein's

October 10, 1999 letter, Exhibit A attached to the Supplemental Affidavit). And, as shown in the

attached Affidavits and the Supplemental Affidavit of Mr. Epstein, Mr. Epstein has always owned and controlled all intellectual property, proprietary documentation and processes (referred to hereafter as "Mr. Epstein's trade secrets"), which he created and developed at his former company, SME. (Supplemental Affidavit of Epstein ¶ 31-35).

Thus, staggeringly, Bard's own attorney admitted that **Bard had absolutely no rights in the technology and processes developed by Mr. Epstein** to produce catheters possessing the needed specifications. Due to this admission, Bard should be precluded from asserting that Bard could produce catheters to specification before the advent of Mr. Epstein's trade secrets. Also, in light of the above admission, Bard should be precluded from making incorrect assertions such as: "[Mr. Epstein] proved profoundly unable to manufacture the Tigertail product up to Bard's specifications." (See Defendant C.R. Bard, Inc.'s Motion To Dismiss Counts II, III, IV, V, VI, VII, VIII And X Of Plaintiff's Complaint, "Bard's Memorandum", p. 5, n. 1) Moreover, Bard's admission, coupled with the Affidavits of former employees of Bard and others involved with the technology verifying the operability of Mr. Epstein's developments should ensure that Bard is estopped from uttering any further incorrect assertions.

With Bard's admission in hand, any assertion that Bard was not in need of Mr. Epstein's trade secrets is counterintuitive. Mr. Epstein posits, if Bard possessed the technology required to reach Bard's catheter specifications, why didn't Bard go directly to Futuremed or another large company and employ a large entity to produce the catheters more cheaply and in the process nix a small entity like Mr. Epstein from the equation? The only answer is that Bard could not accomplish the specifications and decided to utilize Mr. Epstein in order to acquire his trade secrets. These findings additionally shed new light on Bard's, Futuremed's and Crossbow's

5

failure to respond to Mr. Epstein's inquiries and overall scheme to impede Mr. Epstein from discovering the truth.

As shown in the Complaint, the attached Affidavits and the Supplemental Affidavit, Bard followed a deliberate path stymieing Mr. Epstein's reasonable diligence by promising affidavits and answers. (See the Supplemental Affidavit, ¶7-29.)  Thus the fraudulent concealment of facts, which extended the reasonable time for imputing knowledge of an action upon Mr. Epstein, coupled with standard for dismissal, additionally heightens the level of scrutiny Bard must overcome.

For purposes of tolling the statute of limitations for the period during which the person concealed the existence of the cause of action from the knowledge of the person entitled to bring it, the standard imposing upon that person the requirement that he show "reasonable diligence" in discovering the cause of action is not applicable. *Demoulas v. Demoulas Super Markets, Inc.* 677 N.E.2d 159, 174 (Mass. 1997).  M.G.L.A. c. 260 §12.  Additionally, Chapter 260, § 12 tolls the statute of limitations where the wrongdoer either concealed the existence of the cause of action through an affirmative act done with the intent to deceive or breached a fiduciary duty of full disclosure. See *Bakis v. National Bank of Greece, S.A.* 1998 WL 34064622, at *12 (Mass. Super. Ct. 1998) (citing G.L.c. 260, § 12 (1994); *Protective Life Insurance Co. v. Sullivan,* 425 Mass. 615, 632 (1997)).

> Even in instances of active concealment not involving a duty to disclose, we have only attributed knowledge to a plaintiff who had actual knowledge of the facts, or had the means to acquire such facts, in circumstances where the probability of wrongdoing was so evident that possession of the means was equivalent to actual knowledge. See *Lynch v. Signal Fin. Co, of Quincy,* 367 Mass. 503, 507-508, 327 N.E.2d. 732 (1975) (statute not tolled where plaintiff, who knew loan terms and extent of lender's disclosures, could have discovered nondisclosures by merely making mathematical calculations from known data); *Bracket v. Perry,* 201 Mass. 502, 505, 87 N.E. 903 (1909) (cause of action accrued when demand for payment from third party gave plaintiff full means to detect fraud by defendant). See also

6

*Tracerlab, Inc. v. Industrial Nucleonis Corp.*, 313 F.2d 97, 98-102 (1st Cir. 1963) (in action against former employees' corporation for trade secret violation under Massachusetts law, plaintiff had only suspicion, opinion, and conjecture, not actual knowledge, and lacked means to obtain facts, until patent issued).

*Demoulas*, 677 N.E.2d at 174. "This court has recognized the unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another." *Bowen*, 557 N.E.2d at 774-41.

As outlined throughout the Complaint, the attached Affidavits and particularly in paragraphs 7 through 29 of the Supplemental Affidavit, from 1999 until the date of filing the Compliant, Mr. Epstein diligently attempted to ascertain whether the actions of the several Defendants prejudiced Mr. Epstein's trade secrets in any manner. (See the Supplemental Affidavit of Epstein, ¶ 7-29.) Thus, Mr. Epstein contacted Bard from October 1999 to December 2000 and received absolutely no answers regarding his good faith inquiries. (See the Supplemental Affidavit of Epstein, ¶ 7-29.) Mr. Epstein also directed his Counsel to contact Bard and his Counsel was met with the same resistance. (See the Supplemental Affidavit of Epstein, ¶ 7-29.)

Consequently, scrutinizing Bard's complete non-compliance with Mr. Epstein's earnest questioning under the above standards, Mr. Epstein can not be held to have possessed "reasonable knowledge," "have known or reasonably should have known" that he may have been harmed by the conduct of Bard in selling catheters. According to Mr. Epstein's October 10, 1999 letter, he was under the assumption that Bard still could have been selling Mr. Epstein's old units. (See the Supplemental Affidavit of Epstein, ¶ 7,8). Thus, Mr. Epstein's inquiries qualify as suspicion, opinion, and conjecture, but never actual knowledge.

Finally an interesting admission of Futuremed is extremely telling regarding the state of mind of Mr. Epstein upon drafting the October 10, 1999 initial letter of inquiry. Curiously,

7

Futuremed chose to illustrate the "'**confusion**' [of Mr. Epstein] about the fact that Bard appeared to be marketing catheters similar to those he had previously provided." (See Futuremed Memorandum, p.3, ¶3.) Thus, even Futuremed clearly appreciated and definitively admitted that Mr. Epstein was in no way certain of allegations, but rather Mr. Epstein was merely probing and receiving absolutely no answers from Bard. Surely, a confused would be Plaintiff could not possess the requisite knowledge to file suit.

### C.   The Fraud Based Claims Have Been Pled With Requisite Particularity In Accordance With Rule 9(b) of the Federal Rules of Civil Procedure.

Mr. Epstein filed the present action on October 15, 2003 in the Suffolk Superior Court Business Litigation Session in the Commonwealth of Massachusetts. On November 17, 2003, Defendants removed the present action to the United States Federal Court District for Massachusetts. Presently, with regard to Mr. Epstein's fraud based claims, Bard asserts that Mr. Epstein should be held to the particularity requirements of the Federal Rules of Civil Procedure, without allowance of any amendment.

Despite Mr. Epstein's factually intensive, 27 page Complaint, including the above mentioned numerous affidavits, Bard moves this Court to dismiss Count VI ("Misrepresentation"), Count VII ("Negligent Misrepresentation") and Count VIII ("Fraudulent Concealment") for lack of particularity under rule Fed. R. Civ. P. 9(b). (Bard Memorandum, p. 8.)

In asserting that Mr. Epstein's claims based on fraud have not been pled with the requisite particularity, Bard appears to detail lengthy legal precedent. (Bard Memorandum, p. 8-12.) However, Bard wholly fails to illustrate how Mr. Epstein's claims fall short of compliance with the requirements of any legal standards. In fact, Bard never applies the standards discussed

to the facts at hand in any intelligible manner. As shown below, Mr. Epstein has been wholly compliant with the particularity requirements of Rule 9(b).

"A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir. 1989)(citing *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987) (citing *Semegen v. Weidner,* 780 F.2d 727, 734-35 (9th Cir.1985))).

> In *Wool,* we explained that allegations of fraud based on information and belief usually do not satisfy the particularity requirements under Rule 9(b). However, the rule may be relaxed as to matters within the opposing party's knowledge. For example, in cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts. "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded." Instances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual.

*Moore,* 885 F.2d at 540 (citations omitted).

In the First Circuit, this means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir. 1997). As shown below Mr. Epstein has specified the statements, the speakers of the statements, when and where the statements were made and why the statements were fraudulent to the best of his current knowledge.

## 1.    Misrepresentation and Negligent Misrepresentation

Bard's statements regarding the source of the FDA 510(k) disclosure were fraudulent. (Complaint ¶ 27, ¶ 30-31 and ¶47.) Thus, Mr. Epstein's allegations of fraud against Bard are supported by Mr. Epstein's Complaint and corroborating Affidavits, as well as by Mr.

Epstein's Supplemental Affidavit. (Id. at ¶ 50 and ¶ 110-120, Epstein's Supplemental Affidavit ¶ 18, ¶ 27 and ¶ 61.)

Further, as required by Fed. R. Civ. P. 9(b), Mr. Epstein has demonstrated the particularity of his claims regarding the misrepresentations surrounding the fraudulent transfer of Mr. Epstein's trade secrets. These misrepresentations impaired Mr. Epstein's potential and credibility in the catheter industry. Finally, as set forth in Mr. Epstein's Complaint and corroborated in Affidavits supporting the Complaint, and Mr. Epstein's Supplemental Affidavit, the actions surrounding the fraudulent transfer of Mr. Epstein's proprietary information, technology and trade secrets from Bard to Futuremed occurred in Massachusetts.

## 2. **Fraudulent Concealment**

As shown in the Complaint, Mr. Epstein informed Bard, Futuremed and Crossbow that all Defendants were misrepresenting to the public that its catheters were constructed based on technology that was Futuremed's, when in fact, Bard was fraudulently concealing from others that the catheters were based upon a transfer of Mr. Epstein's proprietary information from Bard to Futuremed. (Mr. Epstein's Supplemental Affidavit ¶ 7-19 and ¶ 27-28.) Further, Bard's fraudulent concealment of these same facts from Mr. Epstein in not responding to Mr. Epstein's inquiries, clearly gives rise to Mr. Epstein's claim. (Id. at ¶ 27-28 and ¶ 55.) Thus applying the pleading requirements of Rule 9(b) to the complaint and Affidavits, Mr. Epstein has established a sound factual basis in the Complaint.

In the alternative, in the event that this Court finds that the Complaint does not meet with the particularity requirements of Fed. R. Civ. P. 9(b), Mr. Epstein requests leave of Court to amend the Complaint under Fed. R. Civ. P. 15(a) to comply with Fed. R. Civ. P. 9(b). Mr. Epstein requests leave to amend particularly in light of the fact that it was Bard who removed the

Complaint from Suffolk Superior Court, Business Litigation Section to the Federal District Court. Rule Fed. R. Civ. P. 15(a) states as follows:

> Amendments. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. **Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.** A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Fed. R. Civ. P. 15(a). It is within the discretion of this Court to freely grant leave to amend the Complaint as follows:

> Leave to amend a pleading under Fed.R.Civ.P. 15(a) is a matter within the discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). An order denying leave to amend will be overturned only for an abuse of that discretion, the exercise of which should be guided by the criteria set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962): "In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, under prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. the leave should, as the rules require, be 'freely given.'"

*Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 896 (1st Cir. 1979). Thus, since Defendants have removed this action to the this Court, and there will be no undue delay, bad faith or dilatory motive on the part of the Mr. Epstein, this Court should allow Mr. Epstein to amend the Complaint if the complaint is deficient under Rule 9(b).

**D.    Mr. Epstein's Count II, Tortious Interference With Contractual Relationships, Has Been Pled With The Requisite Particularity.**

Bard asserts that "[b]ecause Plaintiff fails to allege that Bard interfered with a single contemplated contract or prospective business relationship, Count II must be dismissed." (See

Bard's Memorandum of Law in Support of Defendant C.R. Bard, Inc.'s Motion to Dismiss Counts II, III, IV, V, VII, VIII and X of Plaintiff's Complaint, "Bard's Memorandum," p. 12, ¶2.)  However, as definitively demonstrated in the Complaint, the attached Affidavits, and the Supplemental Affidavit of Mr. Epstein, an existent contract, contemplated contracts, existent business relationships and prospective business relationships were all interfered with by Bard. Particularly, Bard illicitly severed Bard's business relationship and contract with Mr. Epstein by misappropriating Mr. Epstein's trade secrets and forwarding the secrets to Futuremed.  As shown below, the obvious motive for Bard's actions was to prevent Mr. Epstein from producing and profiting from his own inventive matter, in order that Bard could more cheaply produce catheters using Mr. Epstein's methods.

In its Memorandum, Bard quotes the applicable standard as follows:

> The specific elements which must be proved to establish intentional interference with advantageous business relations are: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship [or contract]; (3) the defendant's intentional and malicious interference with it; [and] (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.

*Elm Medical Laboratory, Inc. v. RKO General, Inc.,* 532 N.E.2d 675, 681 (Mass. 1989) (citation omitted)(See Bard Memorandum, p. 12, ¶ 3).  However, it escapes Bard that a thorough application of this standard to the facts of the instant action, clearly illustrates the existence of, at very least, an illicitly severed relationship between Mr. Epstein and Bard.  This relationship clearly reached the level required to sustain a cause of action for interference with contractual relationships.

Addressing the first prong of *Elm Medical*, as well delineated in the Complaint, the attached Affidavits, and the Supplemental Affidavit of Mr. Epstein, a business relationship and contemplated contracts of economic benefit were forged between Mr. Epstein and Bard.  (See the

Complaint, ¶10-26; See also the Affidavit of Scott Epstein, Exhibit D attached to the Complaint ¶12-20; See also the Supplemental Affidavit of Epstein, ¶ 36-54.) As stated throughout this action, Bard was incapable of manufacturing catheters within certain needed specifications. Bard discovered that Mr. Epstein developed and possessed trade secrets that could reach these specifications, contacted Mr. Epstein and created a relationship with Mr. Epstein, which included Bard's receipt of Mr. Epstein's trade secrets and Bard's placement of a single order for catheters. (See the Complaint, ¶10-26; See also the Affidavit of Scott Epstein, Exhibit D attached to the Complaint ¶12-20; See also the Supplemental Affidavit of Epstein, ¶ 36-54.)

Applying the second prong, obviously Bard possessed knowledge of the relationship and contract between Mr. Epstein and Bard as Counsel for Bard M. Banks Neil admitted that Mr. Epstein produced catheters of certain specification for Bard. (See also the Supplemental Affidavit of Epstein, ¶ 7.). Thus, among others, the most glaring confirmation of Bard's knowledge was Bard's admission of production of catheters for Bard by Mr. Epstein. (See also the Supplemental Affidavit of Epstein, ¶ 7.)

Applying the third prong, Bard's intentional and malicious interference with the relationship and contract, it is no stretch to state that malice is imputed by simply viewing Bard's actions. As Bard's continued failure to produce catheters meeting specification evinces, if not for the advances created by Mr. Epstein, Bard could not have produced the much needed catheters. (See also the Supplemental Affidavit of Epstein, ¶ 6, 36-51.) Upon receipt of Mr. Epstein's processes which allowed the production of catheters within specification, Bard basically sabotaged the relationship, shutting Mr. Epstein out, and opting to turn Mr. Epstein's trade secrets over to Futuremed for production of the catheters. Bard's motives are also obvious,

13

as Futuremed, being a much larger entity than Mr. Epstein, could produce the catheters cheaply and in a greater quantity.

Applying the final prong, Mr. Epstein's loss of advantage directly resulting from Bard's conduct is apparent. Mr. Epstein basically lost his livelihood by upgrading his operation to meet the needs of Bard, just to have Bard pull out just subsequent to Mr. Epstein making his investment, without any explanation whatsoever. (See the Supplemental Affidavit of Epstein, ¶ 80.)

Beyond the scope of Mr. Epstein's existent contract, contemplated contracts and business relationship with Bard, the conversion of Mr. Epstein's trade secrets clearly prevented Mr. Epstein from contemplated contracts and prospective business relationships. (See the Supplemental Affidavit of Epstein, ¶ 81.) First, due to Bard's filing with the FDA, Mr. Epstein will not be able to receive FDA approval of his own invention. Second, Bard's far reaching sales will surely preclude any attempt Mr. Epstein can muster toward selling catheters in the same industry. Thus, Bard's continued sales of catheters exhibiting the specifications of Mr. Epstein's trade secrets verifies the contemplated contracts and prospective business relationships Mr. Epstein would have entered into but for the actions of Bard. Bard's actions clearly illustrate Bard's need for catheters exhibiting the characteristics of those manufactured under the parameters and specifications of Mr. Epstein's processes.

Thus, under the elevated standard for dismissal established in *Rumford Pharmacy*, treating all allegations in the complaint as true and drawing all reasonable inferences therefrom in favor of Mr. Epstein, an existent contract, contemplated contracts, existent business relationships and prospective business relationships were all interfered with by Bard. See *Rumford Pharmacy, Inc. v. East Providence*, 970 F.2d 996, 997 (1st cir. 1992). Therefore, Bard's

Motion to Dismiss Count II should be denied and Mr. Epstein's cause for interference with contractual relationships should stand as pled.

### E.   Count X Contains All Required Elements To Meet With The Requirements Of Mass. Gen. L. Ch. 93A §§ 2 And 11 As Pled.

Bard alleges that Count X of Mr. Epstein's Complaint does not contain all required elements stating as follows: "Plaintiff fails to allege that the center of gravity of the circumstances that give rise to his 93A claim was primarily and substantially in Massachusetts." (Bard's Memorandum, p. 13, ¶2.) As shown below, Count X contains all of the necessary elements to meet with the requirements of Mass. Gen. L. ch. 93A §§ 2 and 11 as pled.

Mass. Gen. L. ch. 93A §11 stands for the proposition that:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Gen. Laws. ch. 93A, § 11. As shown below, Bard has clearly failed to meet its burden. In attempting to establish a standard of inquiry regarding 93A, Bard places reliance in *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 781 N.E.2d 787 (1st Cir. 2003), which stands for the following proposition:

> Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

*Kuwaiti Danish*, 781 N.E.2d at 799. *Kuwaiti Danish* also stands for the proposition that a 93A claim must fail where the "pivotal events underlying [the] 93A claim" occurred outside Massachusetts. *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 235-36 (1st Cir. 2003). However, Bard fails to appreciate that the Court in *Kuwaiti Danish* stated as follows:

> We have misgivings about the utility of a formula for analyzing all cases under § 11. **Whether the "actions and transactions [constituting the § 11 claim] occurred primarily and substantially within the commonwealth" is not a determination that can be reduced to any precise formula.** Significant factors that can be identified for one case may be nonexistent in another. Any determination necessarily will be fact intensive and unique to each case.

*Kuwaiti Danish,* 781 N.E.2d at 798 (emphasis added). Thus, the inquiry regarding the factual bases supporting a 93A claim is not as simplistic as Bard asserts, as no precise formula has been accepted.

In application of the "center of gravity" and "pivotal events" theories, devoid of offering any proof whatsoever of these facts, Bard asserts "that the pivotal event underlying Plaintiffs' 93A claim occurred when 'Gary Teague [then an employee in BUD's Covington offices] and or [sic] BUD caused the disclosure of [Plaintiffs' technology to a third party, [Futuremed].'" (Bard's Memorandum, p. 14, ¶1.) Curiously, in the very next sentence, Bard disputes these facts. (Bard's Memorandum, p. 14, ¶1.) Here, Bard must fail for two reasons.

First, without accepting the transaction wherein BUD transferred Mr. Epstein's technology to Futuremed as true, Bard cannot base dismissal on these facts. (Bard's Memorandum, p. 14, ¶1.) Thus, without acceptance of the transfer, Bard must fail for lack of any argumentative matter.

Second, even taking as true the transaction described in the Complaint wherein BUD transferred Mr. Epstein's technology to Futuremed, Bard fails to appreciate that Bard took possession of Mr. Epstein's trade secrets with illicit intent in Massachusetts. (See the Complaint, ¶10-26; See also Epstein's Supplemental Affidavit, ¶6, 36-47.)

Investigating the events leading up to the transfer of Mr. Epstein's trade secrets, Bard recognized the utility of Mr. Epstein's trade secrets to reach catheter specifications Bard consistently failed to achieve. (See the Complaint, ¶10-26; See also Epstein's Supplemental

16

Affidavit, ¶6.) On several occasions, multiple representatives of Bard visited Mr. Epstein's place of business in Massachusetts and viewed Epstein's trade secrets. (See Epstein's Supplemental Affidavit, ¶36-47.) Further, during these visits to Mr. Epstein's place of business, representatives of Bard entered into non-disclosure agreements. (See Epstein's Supplemental Affidavit, ¶41.) The visits by Bard's representatives culminated in Bard's removal from Mr. Epstein's place of business of many documents illustrative of Mr. Epstein's trade secrets. (See Epstein's Supplemental Affidavit, ¶46.)

Thus, over a span of years, Bard acquired Mr. Epstein's trade secrets in Massachusetts and then swiftly transferred the secrets to Futuremed. (See Epstein's Supplemental Affidavit, ¶6, 36-47.) Clearly, using time as a basis for applying the "primarily and substantially within the Commonwealth" theory, an overwhelmingly inordinate portion of the complete transaction clearly occurred in Massachusetts. (See the Complaint, ¶10-26; See also Epstein's Supplemental Affidavit, ¶6, 36-47.)

Therefore, Bard pursued Mr. Epstein's trade secrets in Massachusetts, viewed Mr. Epstein's trade secrets in Massachusetts and utilized the information in directing Futuremed, from Massachusetts, to produce the Tigertail for Bard's own purposes. (See Epstein's Supplemental Affidavit, ¶46.) Thus Bard's plan was conceived and hatched upon the visits of the representatives of Bard to Mr. Epstein's place of business and because of this, Bard's actions in Massachusetts constitute the "pivotal events underlying [the] 93A claim" as these actions constitute the root of the entire scheme.

Further, as Bard and the several Defendants have wholly failed to answer any of Mr. Epstein's earnest inquiries, in order to discern what actually transpired, discovery will be needed. Thus in order to fully comprehend the transfer technology under a "center of gravity" and

"pivotal events" theories, discovery will be needed in order to discern what really occurred as Bard and the other Defendants still fail to come forward with any answers.

As a final inquiry,

[t]he United States Court of Appeals for the First Circuit has adopted a three-prong balancing test that looks to (1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct.

*Kuwaiti Danish*, 781 N.E.2d at 798 (citation omitted).  Applying the first prong, Bard clearly committed the unfair or deceptive act or practice upon Mr. Epstein in Massachusetts.  Applying the second prong, Mr. Epstein received the wrongful conduct in Massachusetts.  Applying the final prong, Mr. Epstein sustained losses caused by the wrongful conduct in Massachusetts. Therefore, all three of these prongs end toward the evolutions in Massachusetts and as such the majority of the plan was clearly formulated, initiated and completed in Massachusetts.

Therefore, under the elevated standard for dismissal established in *Rumford Pharmacy*, treating all allegations in the complaint as true and drawing all reasonable inferences therefrom in favor of the Mr. Epstein, the "pivotal events underlying [the] 93A claim" and "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  See *Rumford Pharmacy*, 970 F.2d at 997.  Therefore, Bard's Motion to Dismiss Count X should be denied and Mr. Epstein's Count X should be stand as pled.

## F.    Counts VI, VII and VIII of the Complaint Are Not Pre-Empted

Bard alleges that Counts VI, VII and VIII must be dismissed for lack of subject matter jurisdiction since they are pre-empted by the Federal Food, Drug and Cosmetic Act (FDCA), 52 Stat. 1040.  In asserting that Mr. Epstein can be granted relief from the Food and Drug Administration, (FDA), Bard confuses the types of injury which can be reached by the FDA.

18

> The FDA is empowered to investigate suspected fraud, see 21 U.S.C. § 372; 21 CFR § 5.35 (2000), and citizens may report wrongdoing and petition the agency to take action, § 10.30. In addition to the general criminal proscription on making false statements to the Federal Government, 18 U.S.C. § 1001 (1994 ed., Supp. V), the FDA may respond to fraud by seeking injunctive relief, 21 U.S.C. § 332, and civil penalties, 21 U.S.C. § 333(f)(1)(A) [liable to the United States]; seizing the device, § 334(a)(2)(D); and pursuing criminal prosecutions, § 333(a).

*Buckman Co. v. Plaintiffs' Legal Committee* 531 U.S. 341, 349 (2001). Thus the FDA is clearly not equipped to recompense a Plaintiff from whom trade secrets have been converted and filed for FDA certification.

Additionally, the factual basis of *Buckman* only serves to further bolster Mr. Epstein's assertions. Distinguishing *Buckman*, the Plaintiff in *Buckman* was injured due to utilizing an orthopedic bone screw which received approval on fraudulent representations to the FDA. Mr. Epstein has never asserted that the catheters were illicitly granted FDA authorization in the technical realm and thus the fraud involved would cause physical harm to the public user. Instead, as shown above, in the instant action, the fraudulent activity occurs where Bard secured FDA authorization with technically correct trade secrets belonging not to Bard or the other Defendants, but to Mr. Epstein alone. Thus the injury here is felt solely by Mr. Epstein and not the FDA or the general public and the FDA is clearly not equipped to provide Mr. Epstein a proper remedy.

Finally, as illustrated in *Buckman*, the impetus of barring certain state law claims through pre-emption in the FDA realm tends from the ill effects surrounding

> applicants' fear that their disclosures to the FDA will later be judged insufficient in state court might lead them to submit information that the Administration neither needs nor wants, thus delaying the comparatively speedy § 510(k) process, and, in turn, impeding competition and delaying the prescription of appropriate off-label uses.

*Id.* 531 U.S. at 342. Thus, the genre of regulation reached in *Buckman* can never be afforded to Mr. Epstein by the FDA as the factual basis in the instant action never lends toward fear of

19

insufficient disclosures. Instead, the fraud clearly injures one individual being, Mr. Epstein and the only proper levy of damages comes from this Court.

## III.   CONCLUSION

Wherefore, based upon the aforementioned reasons, Bard's Motion to Dismiss should be denied and all Counts of Mr. Epstein's Complaint should stand as pled. In the alternative, if this Court finds the Complaint deficient for any reason, Mr. Epstein requests that this Court grant leave to allow Mr. Epstein to amend his complaint to comply with the standards set forth in Fed. R. Civ. P. 8 and Fed. R. Civ. P. 9 (b).

## IV.   REQUEST FOR ORAL ARGUMENT PURSUANT TO LOCAL RULE 7.1(d)

Plaintiff, Scott M. Epstein requests oral argument on this motion pursuant to Local Rule 7.1(d).

Dated: 2/18/2004

Attorney for Plaintiff


Gary E. Lambert, Esq.
LAMBERT & ASSOCIATES
92 State Street, Suite 200
Boston, MA 02109
Tel. 617-720-0091
Fax 617-227-0313

By:

Gary E. Lambert, Esq.
BBO#: 548,303

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all the attorneys of record on February 18, 2004 by First Class Mail, Postage Pre-Paid to:

Attorney Michael Albert
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210

Attorney Andrew Good
Good & Cormier
83 Atlantic Avenue
Boston, MA 02110

Attorney Samuel Levy
Wuersch & Gering LLP
11 Hanover Square, 19th Floor
New York, NY 10005

_Melissa Patangia_

Melissa J. Patangia
for Gary E. Lambert, Esq.