

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT M. EPSTEIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 03 CV 12297 (RWZ) |
| ) | |
| C.R. BARD, INC., ) | |
| FUTUREMED INTERVENTIONAL, INC., ) | |
| and CROSSBOW VENTURES, INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT FUTUREMED'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND REQUEST FOR ORAL ARGUMENT PURSUANT TO LOCAL RULE 7.1(d)

### I.  INTRODUCTION

Defendant Futuremed Interventional, Inc. (referred to hereafter as "Futuremed") has moved to dismiss Plaintiff's (referred to hereafter as "Mr. Epstein") Complaint arguing that (1) the Complaint is time-barred as a matter of law, (2) Mr. Epstein lacks standing, and (3) the Complaint fails to allege facts sufficient to state a claim again Futuremed.

For the reasons set forth herein, Mr. Epstein opposes Futuremed's motion on all bases. First, based upon the documents referenced in Mr. Epstein's Complaint, Mr. Epstein's claims are timely. Second, Mr. Epstein does have standing to sue as the trade secrets and technology at issue belong to Mr. Epstein and not to a third party. Mr. Epstein never transferred ownership or title in his proprietary information, trade secrets, or technology. Third and finally, Futuremed is an integral part of the entire transaction involving Mr. Epstein, Defendant C.R. Bard, Inc.

SCANNED
DATE  2-19-04
BY  _____

1

(referred to hereafter as "Bard"), and Defendant Crossbow Ventures, Inc. (referred to hereafter as "Crossbow"). Therefore, Futuremed is not the actionless entity it alleges to be.

As shown below, Mr. Epstein's claims as pled more than meet the level of scrutiny for dismissal purposes and as a result, Futuremed's Motion to Dismiss should be denied and Mr. Epstein's claims should stand as pled. As an alternative, if needed, Mr. Epstein should be allowed to amend his Complaint.

Prior to addressing the three grounds of Futuremed's Motion to Dismiss, Futuremed first sets forth its allegedly "Undisputed Factual Background" of Mr. Epstein's Complaint and the Letters Referenced in the Complaint.

### A.    The Complaint

Futuremed claims that Mr. Epstein's Complaint "says almost nothing about Futuremed." (See Futuremed's Memorandum in support of Futuremed's Motion to Dismiss Epstein's Complaint, referred to hereafter at Futuremed's Memorandum, p. 2.)    The facts and the allegations set forth in the Complaint truthfully describe the conduct of Futuremed to the best of Mr. Epstein's knowledge and belief of the facts. As set forth in the Complaint, Futuremed is an integral part of the transaction involving Mr. Epstein, Bard, and Crossbow, whether they would like to acknowledge this fact or not.

Further, Futuremed states that Bard had sold the catheters at issue on the open market. (Futurmed Memorandum, p. 2.) In addition, Futuremed states that it would be free to copy Mr. Epstein's catheters. (Id.) Futuremed's assertions to this respect are incorrect. A product that is publicly available is not lawfully imitated. Selling on the open market does not waive any rights and privileges in Mr. Epstein's trade secrets and technology or proprietary processes. Mr. Epstein has never waived any rights to his trade secrets and technology. (Epstein's

2

Supplemental Affidavit ¶ 30 and ¶ 35.) Even if the catheters themselves produced by Mr. Epstein were in the public domain, the manner in which to produce the catheters, including the materials, processes and parameters involved, were certainly not publicly disclosed as proven by Bard's own folly. Bard's seeing the catheters did not aid them in overcoming their own limitations and allow Bard to produce catheters. (Id. at ¶ 6 and ¶ 36.) In fact, the proprietary processes, the specifications and parameters, and materials, needed to manufacture the catheters are the apex of Mr. Epstein's trade secrets. As the inventor, Mr. Epstein was obviously the most knowledgeable and a necessary party to proper production of the catheters.

Moreover, Futuremed was aware of its own conduct and was specifically put on notice by Mr. Epstein on November 11, 2000, when Mr. Epstein contacted Crossbow because he discovered an existing relationship between Futuremed and Crossbow. (Complaint ¶ 42, Epstein's Supplemental Affidavit ¶ 17.) At that point, Futuremed should have taken the necessary steps to investigate any allegations of wrongdoing. Instead, Futuremed chose to ignore Mr. Epstein and his pleas for assistance.

In conclusion, as Mr. Epstein's Complaint has shown, Bard was unable to achieve an operational Tigertail catheter without making use of Mr. Epstein's trade secrets, technology and proprietary processes. (Complaint ¶ 24, Affidavit of Duane Dunn ¶ 12 and ¶ 14-15, and Epstein's Supplemental Affidavit ¶ 6.) Consequently, Futuremed would not have been able to manufacture such a catheter for Bard without adhering to Mr. Epstein's own trade secrets, technology and proprietary processes.

**B.    The Letters Referenced In The Complaint**

Futuremed urges the Court to consider letters written by Mr. Epstein to Bard as a basis for dismissing the Complaint against Futuremed. (Futuremed's Memorandum, p. 2-3.) On the

contrary, the Court should not take into consideration these letters written to Bard by Mr. Epstein in determining whether or not to dismiss Mr. Epstein's Complaint against Futuremed. (Exhibits A-E attached to Futuremed's Memorandum). As a review of these letters reveals, Mr. Epstein addressed these letters only to Bard. Mr. Epstein does not even allege or mention Futuremed (or Crossbow for that matter) in his correspondence with Bard. As a result, how can Futuremed place any reliance on Mr. Epstein's October 10, 1999 letter to Bard?    (Futuremed's Memorandum, p. 3.)

The Complaint references these letters to clearly show a pattern of conduct by Bard that evidences evasive tactics and avoidance of Mr. Epstein and Mr. Epstein's counsel. Bard's subsequent written replies to Mr. Epstein never affirmed or denied the suspicions expressed in his October 10, 1999 letter.   (Epstein's Supplemental Affidavit ¶ 7 and ¶ 10, Epstein's Supplemental Affidavit Exhibits C and Exhibit G.) As far as the letter to Bard is concerned, Mr. Epstein, at the time of writing this letter to Bard in 1999, was not aware of the facts and circumstances surrounding this suit because Bard never properly looked into his allegations as Bard had promised to Mr. Epstein. (Epstein's Supplemental Affidavit ¶ 22-23.) Even when Mr. Epstein wrote to Futuremed and Crossbow in November of 2000, he received no response from either party. (Epstein's Supplemental Affidavit ¶ 17, Supplemental Affidavit Exhibit J.)

Finally, Mr. Epstein has always held onto ownership of his trade secrets and technology except for a period of time when he disclosed it to Bard for the purposes of a possible license. (Epstein's Affidavit ¶ 11 and ¶ 20, Epstein's Supplemental Affidavit, ¶ 30-31 and ¶ 35.) Therefore, Mr. Epstein is the proper party to bring suit rather than SME Design (referred hereafter as "SME") and/or Medical Device Labs, Inc. (referred hereafter as "MDL"), both of which are no longer incorporated. (Epstein's Affidavit ¶ 3-4, Epstein's Supplemental Affidavit

4

¶ 31 and ¶ 34-35.)

## II.   ARGUMENT

### A.   Each of Mr. Epstein's Claims Are Not Time Barred By The Statute of Limitations.

#### 1.   Mr. Epstein's October 11, 1999 Letter to Bard.

None of Mr. Epstein's claims are time barred by the statute of limitations, especially Mr. Epstein's claims against Futuremed. Futuremed has asserted that all of Mr. Epstein's claims are barred based upon a letter written by Mr. Epstein to Bard on October 10, 1999. (Futuremed Memorandum, pp. 3-5.) In this letter, Mr. Epstein inquires as to the location of additional inventory of catheters that appeared to be manufactured based upon Mr. Epstein's trade secrets and technology. (Epstein's Supplemental Affidavit Exhibits A and B.) As a review of the letter reveals, Mr. Epstein's letter was written only to Bard and it was intended only to address issues Mr. Epstein had with Bard at the time. (Id.)

As admitted by Futuremed in its Memorandum, Mr. Epstein expressed "confusion" in his letter to Bard. (Futuremed Memorandum, p. 3.) Bard's representation to Mr. Epstein that Bard had no files or information pertaining to him at Bard caused him confusion -- as this was a company that he been doing business with for several years. (Epstein's Supplemental Affidavit ¶ 10 and ¶ 15, Epstein's Supplemental Affidavit, Exhibits C and G.) Bard's false promise of conducting an "investigation" into his inquires, that obviously never occurred, has added to Mr. Epstein's confusion as to Bard. (Epstein's Supplemental Affidavit ¶ 16.) The representation by Bard that it had evidence to refute Mr. Epstein's assertions and the fact that such evidence has never been shared with Mr. Epstein further justifies confusion. (Id. at ¶ 23- 24.)

In addition, Futuremed's claim that Mr. Epstein was aware by October 10, 1999, that Bard had obtained an alternative supplier is simply not true. (Futuremed's Memorandum p. 3.)

Mr. Epstein was completely unaware of any alternative supplier being used by Bard at that time. At that point in time, Mr. Epstein was not aware if the catheters being supplied were his own which had originally been supplied to Bard or whether the catheters being offered by Bard had been generated by another source for Bard. (Epstein's Supplemental Affidavit Exhibits A and B.) Because Bard never responded to Mr. Epstein on this issue or offered Mr. Epstein any explanation, Mr. Epstein was not able to make any determination or come to a conclusion based upon his letter to Bard. (Epstein's Supplemental Affidavit ¶ 19, ¶ 24-25.)

## 2.    Mr. Epstein's November 11, 2000 Letter to Crossbow.

On or about November 11, 2000, Mr. Epstein wrote a letter to both the Directors of Crossbow and a letter to the executives at Crossbow to inform them that he was suspicious of Futuremed and its relationship with Bard. (Epstein's Supplemental Affidavit ¶17, Epstein's Supplemental Affidavit, Exhibit J.) Mr. Epstein explained to Crossbow that he suspected that Bard had transferred his technology to Futuremed. (Epstein's Supplemental Affidavit ¶ 17.) Mr. Epstein's letter of November 11, 2000 is his first and only statement in writing to Crossbow regarding his suspicion about Futuremed's conduct with Bard. Therefore, if Mr. Epstein was on notice for the purposes of the statute of limitations, the pertinent date is November 11, 2000, not October, 11, 1999, thus making all of Mr. Epstein's claims against Futuremed timely.

Although notified by Mr. Epstein, Crossbow never replied to Mr. Epstein's letters. (Complaint ¶42 and Epstein's Supplemental Affidavit ¶ 18.) Because neither Crossbow nor Futuremed ever responded to Mr. Epstein's written inquiry and Mr. Epstein's allegations, Mr. Epstein was without knowledge as to Crossbow's or Futuremed's opinions on the matter or what there intentions were. (Epstein's Supplemental Affidavit ¶ 18-19.) As the applicable law holds, "[t]he mere failure to respond to a letter does not indicate an adoption unless it was reasonable

6

under the circumstances for the sender to expect the recipient to respond and to correct erroneous assertions." See *United States v. Hale*, 422 U.S. 171, 176 (1975) (failure to contest assertion evidence of acquiescence only if natural under circumstances to object); *Hellenic Lines Ltd v. Gulf Oil Corp.*, 340 F.2d 398, 401 (2d Cir. 1965) (failure to respond to letter, under circumstances reasonably calling for reply, constitutes admission by silence); 4 *Weinstein's Evidence*, P 801(d)(2) (B)(01) at 801-146 (1979) (whether silence constitutes admission depends upon whether denial normal under circumstances). It certainly would have been reasonable under these circumstances for Crossbow and/or Futuremed to respond to Mr. Epstein's written inquiry.

Further, although fraudulent concealment may toll the statute of limitations, tolling does *not* apply if the plaintiff has actual knowledge of the facts giving rise to his claim. *Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E. 2d 159, 174 (Mass. 1997). Mr. Epstein's letters fail to establish that he had such knowledge. Futuremed and Crossbow, would have had the information to provide Mr. Epstein with the requisite knowledge. However, Futuremed, like Bard, never offered Mr. Epstein an explanation or a response to his inquiries.

3.    **Mr. Epstein's Claims Are Clearly Timely.**

Futuremed incorrectly asserts that the "lynchpin" of Mr. Epstein's Complaint is the fact that Bard had retained an alternate supplier. Mr. Epstein has brought these claims not because of the dealings by Bard with other suppliers than Mr. Epstein, but the fact that as alleged in Mr. Epstein's Complaint, Bard has continually misappropriated his trade secrets and technology. (Epstein's Supplemental Affidavit ¶ 63, ¶ 67, ¶ 73 and ¶ 80.) The issue is not the fact that Bard obtained a new maker of the catheters, but the fact that Bard used Mr. Epstein's technology and trade secrets to assist Futuremed in its manufacture of a catheter, which Bard is offering for sale.

7

Thus, the torts committed by Bard, Futuremed and Crossbow have gone unchecked and have been persistently ongoing. Mr. Epstein was never able to verify whether the Tigertails being offered by Bard were his. Bard never confirmed or denied this. However three years later the catheters were appearing at trade shows. (Epstein's Affidavit ¶ 22-28, Epstein's Supplemental Affidavit ¶ 29, ¶ 58, ¶ 67, ¶ 69.) Thus, events that occurred were completely unknown to Mr. Epstein because at first Bard, then Futuremed and Crossbow did not respond to his inquiries.

Claims against Futuremed and Crossbow are not time barred because Mr. Epstein was not even aware of Futuremed's and Crossbow's conduct until at least April of 2002. (Epstein's Supplemental Affidavit ¶ 27, ¶ 54, ¶ 55.) Up until April 2002, Epstein had no knowledge of Futuremed's offering for sale and holding out as its own a product based upon the misappropriation of Mr. Epstein's trade secrets and technology, thus making Mr. Epstein's claims within the period prescribed by applicable statute of limitations. (Id. at ¶ 27, ¶ 54, ¶ 55.)

Since Mr. Epstein filed his Complaint on October 15, 2003 against Bard, Crossbow and Futuremed, Mr. Epstein's Complaint is timely and properly within the statute of limitations in Massachusetts. (Id. at ¶ 21.) Thus the tort claims and the 93A claims of Mr. Epstein should be upheld by the Court and Futuremed's Motion to Dismiss should be denied.

**B.    Mr. Epstein Clearly Has Standing To Sue.**

Despite the assertions of Futuremed in its Memorandum, Mr. Epstein clearly has standing to sue Futuremed.    (Futuremed Memorandum, pp. 5-6.)    When Mr. Epstein stated in correspondence to Bard that the disputed trade secrets were the property of SME, Mr. Epstein was actually representing that the proprietary information, trade secrets and technology belong to him. (Epstein's Supplemental Affidavit, ¶ 7-9, Epstein's Supplemental Affidavit Exhibits A, B and F.)

8

Mr. Epstein was always the owner of SME and MDL. (Epstein's Affidavit ¶ 3-4, Epstein's Supplemental Affidavit ¶ 32-34.) SME and MDL are inseparable and synonymous with Epstein. (Epstein's Supplemental Affidavit ¶ 31-35.) Mr. Epstein was both the President and Treasurer of MDL during the period of its incorporation. (Supplemental Affidavit of Epstein ¶34.) Mr. Epstein does not currently conduct business using SME or MDL. Mr. Epstein was the inventor of the trade secrets and technology at the heart of the case at bar. The trade secrets, technology and proprietary information in dispute belongs only to Mr. Epstein. (Id. at ¶ 30 and ¶ 35.) Mr. Epstein **never** conveyed his ownership of his intellectual property, trade secrets and technology to either SME or MDL. (Id. at ¶ 30 and ¶ 35.)

As a review of the correspondence reveals, all correspondence from SME was written by and signed by Epstein himself. (Epstein's Supplemental Affidavit Exhibits A, B and D, E, F, I and J.) Mr. Epstein was the only source of contact regarding SME. Mr. Epstein was the only person from SME who had dealings with Bard. Bard knew, or should have known, that Mr. Epstein was SME and that he was MDL. Mr. Epstein was the only one who attempted to contact Bard and Mr. Epstein was the only one who wrote to Crossbow to complain about Futuremed.

Surely, as the inventor of the trade secrets, technology and processes for manufacturing the Tigertail catheter, Mr. Epstein would certainly know and has proven ownership of said trade secrets. As the inventor, holder and owner of the trade secrets, he has standing to sue Futuremed. Thus, Futuremed's Motion to Dismiss should be denied.

C.  **The Complaint Alleges Facts Supporting A Claim Against Futuremed Upon Which Relief Can Be Granted.**

Contrary to Futuremed's assertions, Mr. Epstein's Complaint does allege facts supporting claims against Futuremed upon which relief can be granted by this Court.

1.  **Applicable Standards.**

9

As the Federal Rules and the 1st Circuit vehemently mandate, the moving party in a motion to dismiss faces an extremely heavy burden and a high threshold of scrutiny. In deciding a 12(b)(6) motion, the court will "treat all allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the plaintiff." *Rumford Pharmacy, Inc. v. East Providence*, 970 F.2d996, 997 (1st cir. 1992). A court should not dismiss a suit on the pleadings alone "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A complaint should not be dismissed for failure to state a claim unless it appears **beyond doubt** that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed. R. Civ. P. 12(b)(6), 28 U.S.C.A, note 561 (emphasis added).

As was well delineated in the Complaint, the attached Affidavits, and the Supplemental Affidavit of Mr. Epstein, a business relationship and contemplated contracts of economic benefit were forged between Mr. Epstein and Bard. As stated throughout this action, Bard was incapable of manufacturing catheters within certain needed specifications. Bard discovered that Mr. Epstein developed and possessed trade secrets that could reach these specifications, contacted Mr. Epstein, and created a relationship with Mr. Epstein. This relationship included Bard's receipt of Mr. Epstein's trade secrets and Bard's placement of a single order for catheters. (Complaint ¶ 10-26, Epstein's Affidavit ¶ 12-20; Epstein's Supplemental Affidavit ¶ 36-63.)

Mr. Epstein's conclusions are all logically compelled. The stated facts and affidavits that support Mr. Epstein's conclusions have demonstrated what experience indicates is an acceptable level of probability. Thus, Mr. Epstein's "conclusions" stated in his Complaint, Affidavit in Support of the Complaint and his Supplemental Affidavit, become the "facts" for pleading purposes. *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir. 1989).

Consequently, Mr. Epstein has not stated any "bald 'conclusions,'" has shown proof of the facts surrounding his complaint, and has meet the standards required to defeat Futuremed's Motion to Dismiss.

A plaintiff bears the burden to set forth in its complaint *facts* sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Boston & Maine Corp. v. Town of Hampton*, 987 F.2d 855, 865 (1st Cir. 1993) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Mr. Epstein has clearly met this burden in a twenty-seven page complaint complete with supporting affidavits and exhibits.

2.    **The Fraud Claims (Counts VI, VII, and VIII).**

a.    **Misrepresentation and Negligent Misrepresentation.**

Futuremed had a responsibility to check out and verify whether or not the proprietary information transferred from Bard to Futuremed actually belonged to Bard. Futuremed relied on Bard's fraudulent representation that the information submitted to the United States Food and Drug Administration ("FDA") was based upon Bard's own proprietary information. Clearly, as evidenced by Mr. Epstein's Complaint and corroborated in Affidavits supporting the Complaint, and Mr. Epstein's Supplemental Affidavit, Bard's representations to the FDA, as well as to Futuremed, were fraudulent.   Bard's statements regarding the source of the FDA 510(k) disclosure were fraudulent. (Complaint ¶ 27, ¶ 30-31 and ¶47.)  Thus, Mr. Epstein's allegations of fraud against Futuremed are supported by Mr. Epstein's Complaint and corroborating Affidavits, as well as by Mr. Epstein's Supplemental Affidavit.  (Id. at ¶ 50 and ¶ 110-120, Epstein's Supplemental Affidavit ¶ 18, ¶ 27 and ¶ 61.)

Further, as required by Fed. R. Civ. P. 9(b), Mr. Epstein has demonstrated the particularity of his claims. Futuremed was informed of the allegations surrounding this case by

Mr. Epstein in writing and e-mails to the members of the board of directors on November 11, 2000. (Epstein's Supplemental Affidavit ¶ 17-18.) Futuremed wholly ignored Mr. Epstein, just like Bard and Crossbow ignored Mr. Epstein. (Id. at ¶ 18-19.) Mr. Epstein has proven that Bard transferred Mr. Epstein's proprietary information to Futuremed without Mr. Epstein's knowledge or consent. Also, Mr. Epstein has proven that Futuremed received Mr. Epstein's proprietary information, such as Mr. Epstein's trade secrets and technology and then transferred it to its own use by manufacturing and offering for sale a catheter just like the one invented by Mr. Epstein. (Id. at ¶ 64-5 and ¶ 69.)

Because Futuremed and Crossbow neither responded to Mr. Epstein's inquiries nor made any investigation into his claims, Mr. Epstein has been as specific as possible in his claims using the facts that he is aware or and are at his disposal. As set forth in Mr. Epstein's Complaint and corroborated in Affidavits supporting the Complaint, and Mr. Epstein's Supplemental Affidavit, the fraudulent transfer of Mr. Epstein's proprietary information, technology and trade secrets from Bard to Futuremed occurred in Massachusetts.

As set forth in Mr. Epstein's Complaint and corroborated in Affidavits supporting the Complaint, and Mr. Epstein's Supplemental Affidavit, Futuremed has manufactured a catheter that was copied from Mr. Epstein's trade secrets and technology and proprietary information. Futuremed was able to successfully manufacture the device only after Bard transferred Mr. Epstein's proprietary information to Futuremed.

Bard's conduct is imputed to Futuremed because Futuremed is operating and doing business in the medical devices industry and markets. While, it is true that Futuremed never had any direct contact with Mr. Epstein, Futuremed obviously never contacted Mr. Epstein in an effort to evade and avoid Mr. Epstein and his questions. (Futuremed's Memorandum, p. 11.)

12

### b.    Fraudulent Concealment.

Mr. Epstein informed Futuremed and Crossbow that Futuremed was misrepresenting to the public that its catheters were constructed based on technology that was Futuremed's, when in fact, it was fraudulently concealing from others that its catheters were based upon a transfer of Mr. Epstein's proprietary information from Bard to Futuremed. (Epstein's Supplemental Affidavit ¶ 17-19, ¶ 27-28 and ¶ 55.) Futuremed's fraudulent concealment of this fact from Mr. Epstein by not responding to his inquiries, as well as fraudulent concealment from the customers of Futuremed, clearly gives rise to the Mr. Epstein's claim. Mr. Epstein was not aware of this fact until he was advised by Mr. Bill Appling in 2002 that Futuremed was selling catheters which copied Mr. Epstein's proprietary technology in 2001. (Id. at ¶ 27-28 and ¶ 55.)

As discussed above, Bard's conduct is imputed to Futuremed because Futuremed is operating and doing business in the medical devices industry and markets. While, it is true that Futuremed never had any direct contact with Mr. Epstein, Futuremed obviously never contacted Mr. Epstein in an effort to evade and avoid Mr. Epstein and his questions. (Futuremed's Memorandum, p. 11.)

Futuremed failed to exercise reasonable care in producing and selling catheters based upon Mr. Epstein's proprietary information, trade secrets and technology that was transferred from Bard to Futuremed. Futuremed failed to exercise reasonable care even after they were made aware of the situation by Mr. Epstein in writing, failed to respond to Mr. Epstein, and failed to do anything about the situation. Futuremed only took affirmative steps to fraudulently conceal the fact that it made use of Mr. Epstein's proprietary information, trade secrets and technology. (Id. at ¶ 27-28 and ¶ 55.)

### c.    Conclusion.

13

Mr. Epstein has clearly met the requisite standards of pleading pursuant to Fed. R. Civ. P. 9(b). As shown above, Mr. Epstein has particularly set forth facts entitling Mr. Epstein to relief specifically against Futuremed. Consequently, this Court should deny Futuremed's Motion to Dismiss Mr. Epstein's Misrepresentation, Negligent Misrepresentation, and Fraudulent Concealment Counts. In the alternative, if the Court finds that Epstein has not satisfied the requirements for pleading fraud in his complaint pursuant to Fed. R. Civ. P. 9(b), then Mr. Epstein moves for leave of court to amend his complaint to plead his fraud complaint against Futuremed. Mr. Epstein moves for leave of Court to amend his Complaint in the interests of fairness and justice to Mr. Epstein.

### 3.    The Trade Secret Claims (Counts III and IV).

Mr. Epstein has set forth the factual allegations and each material element necessary to sustain recovery for trade secret misappropriation and conversion. (Complaint ¶ 38-40 and ¶ 50, Epstein's Supplemental Affidavit ¶ 36-63).

#### a.    "Misappropriation"

Futuremed's assertions regarding misappropriation are incorrect. (Futuremed's Memorandum, pp. 12-13.) Futuremed did have meetings and did establish a contractual relationship. It is true that Futuremed never contacted Mr. Epstein or his counsel in response to the letters sent by Mr. Epstein to Futuremed and Crossbow on November 11, 2000. (Epstein's Supplemental Affidavit ¶ 17-18.)

The fact that Mr. Epstein's catheters were sold on the open market did not destroy the status of his ownership and possession of the proprietary information and technology. It is ludicrous to suggest otherwise. Mr. Epstein never waived his rights to ownership nor did he assign his rights to anyone. (Id. at ¶ 30-35.) A purchaser on the open market is clearly not privy

to the proprietary processes and trade secrets and technology involved in the design and manufacturing of the device. The device cannot be copied by mere visual inspection. Mr. Epstein's catheters are complex medical devices. If this were the case, Bard would have not needed to transfer the technology to Futuremed and Crossbow.

Futuremed was on notice from Mr. Epstein of the fact that he claimed his information to be a trade secret based upon Mr. Epstein's letter of November 11, 2000. (Id. at ¶ 17-18.) Mr. Epstein's proprietary information was in fact a protected trade secret and the disclosure by third persons at Bard to Futuremed and Crossbow was a breach of the duty to keep secret.

As demonstrated above, this Court should deny Futuremed's Motion to Dismiss Mr. Epstein's Misappropriation Count. In the alternative, Mr. Epstein moves for leave of court to amend his complaint to plead his misappropriation complaint against Futuremed. Contrary to Futuremed's statement, leave of Court to re-plead would not be futile. If the Court finds that Mr. Epstein has not plead this count properly, then, in the interests of justice, the Court should allow Mr. Epstein to amend his complaint.

> **b.    "Conversion"**

In order to establish a case for conversion, a plaintiff must show the following:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 94 (1st Cir. 1993) (citations omitted).

In the Complaint, the attached affidavits and the supplemental affidavits, Mr. Epstein has clearly shown that (1) the defendant, Futuremed, intentionally and wrongfully exercised control

or dominion over Mr. Epstein's personal property; (2) Mr. Epstein had an ownership or possessory interest in the property at the time of the alleged conversion; (3) Mr. Epstein was damaged by the defendant's, Futuremed's, conduct; and (4) if the defendant, Futuremed, legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's, Mr. Epstein's, demand for its return was refused.

Mr. Epstein notified Crossbow regarding Futuremed's conduct in writing, and via emails to the board of directors, however no answer was ever received by Mr. Epstein from either Crossbow or Futuremed. (Complaint ¶42, Epstein's Supplemental Affidavit ¶ 17-18.)  Mr. Epstein notified both the Directors and Corporate officers of Crossbow in writing on November 11, 2000. (Id.) Mr. Epstein's demand for return was obviously refused since he never heard back from Crossbow or Futuremed. Thus, Futuremed was on notice on November 11, 2000. However, Futuremed never answered Mr. Epstein's inquiry regarding conversion of his proprietary information and trade secrets. If Futuremed was not converting Mr. Epstein's technology and trade secrets for its own use, then Futuremed owed a duty to Mr. Epstein to either investigate his claim or to give him the courtesy of a response. Instead, Mr. Epstein was left without answers.

As a result, this Court should deny Futuremed's Motion to Dismiss Mr. Epstein's Conversion Count.  In the alternative, Mr. Epstein moves for leave of court to amend his complaint to plead his conversion complaint against Futuremed.  If the Court finds that Mr. Epstein has not plead this count properly, then, in the interests of justice, the Court should allow Mr. Epstein to amend his complaint.

4.    **The Unjust Enrichment Claim (Count V).**

The circumstances pertaining to the allegations of unjust enrichment set forth in the Complaint clearly surround each defendant, especially Futuremed. The benefits obtained by Futuremed from the manufacturing, marketing and sale of the catheters based upon Mr. Epstein's trade secrets and technology were clearly unjust as discussed above the information utilized to manufacture the catheters, and subsequently market and sell the catheters, was improper. *Brandt v. Wand Partners*, 242 F.3d 6, 16 (1st Cir. 2001).

As a result, this Court should deny Futuremed's Motion to Dismiss Mr. Epstein's Unjust Enrichment Count. In the alternative, Mr. Epstein moves for leave of court to amend his complaint to plead his unjust enrichment complaint against Futuremed. If the Court finds that Mr. Epstein has not provided adequate factual predicates to this claim, the Court should grant leave to allow Mr. Epstein to amend his complaint to comply with the standards set forth in Fed. R. Civ. P. 8 and Fed. R. Civ. P. 9 (b).

### 5. The Chapter 93A Claim (Count X).

Futuremed alleges that Count X of Mr. Epstein's Complaint is impermissibly vague. (Futuremed's Memorandum, p. 15.) Additionally, Futuremed asserts that Count X does not allege that the relevant actions took place in Massachusetts. (Futuremed's Memorandum, p. 15.) As shown below, Count X contains all of the necessary elements to meet with the requirements of Mass. Gen. L. ch. 93A as pled.

Mass. Gen. L. ch. 93A §11 stands for the proposition that:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

17

Gen. Laws. ch. 93A, § 11. Further, *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 781 N.E.2d 787 (1st Cir. 2003), stands for the following proposition:

> Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

*Kuwaiti Danish*, 781 N.E.2d at 799. *Kuwaiti Danish* also stands for the proposition that a 93A claim must fail where the "pivotal events underlying [the] 93A claim" occurred outside Massachusetts. *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 235-36 (1st Cir. 2003). Additionally, *Kuwaiti Danish* stated as follows:

> We have misgivings about the utility of a formula for analyzing all cases under § 11. **Whether the "actions and transactions [constituting the § 11 claim] occurred primarily and substantially within the commonwealth" is not a determination that can be reduced to any precise formula.** Significant factors that can be identified for one case may be nonexistent in another. Any determination necessarily will be fact intensive and unique to each case.

*Kuwaiti Danish*, 781 N.E.2d at 798 (emphasis added). Thus, the inquiry regarding the factual bases supporting a 93A claim is not as simplistic as asserted, as no precise formula has been accepted.

As set forth in Mr. Epstein's Complaint and the supporting documentation, Bard took possession of Mr. Epstein's trade secrets with illicit intent in Massachusetts. (Complaint ¶ 10-26, Epstein's Supplemental Affidavit ¶ 6, ¶ 36-49.)  Investigating the events leading up to the transfer of Mr. Epstein's trade secrets, Bard recognized the utility of Mr. Epstein's trade secrets to reach catheter specifications Bard consistently failed to achieve. (Complaint ¶ 10-26, Epstein's Supplemental Affidavit ¶ 6, ¶ 50-51.)  On several occasions, multiple representatives of Bard visited Mr. Epstein's place of business in Massachusetts and viewed Epstein's trade secrets. (Epstein's Supplemental Affidavit, ¶ 36-49.)  Further, during these visits to Mr. Epstein's place

18

of business, representatives of Bard entered into non-disclosure agreements. (Id. at ¶ 41.) The visits by Bard's representatives culminated in Bard's removal from Mr. Epstein's place of business of many documents illustrative of Mr. Epstein's trade secrets. (Id. at ¶ 46-47.)

Thus, over a span of years, Bard acquired Mr. Epstein's trade secrets in Massachusetts and then swiftly transferred the secrets to Futuremed. (Id. at ¶ 6, ¶ 36-47.)   Clearly, using time as a basis for applying the "primarily and substantially within the Commonwealth" theory, an overwhelmingly inordinate portion of the complete transaction clearly occurred in Massachusetts. (Complaint ¶ 10-26; Epstein's Supplemental Affidavit, ¶ 6, ¶36-47.)

Therefore, Bard pursued Mr. Epstein's trade secrets in Massachusetts, viewed Mr. Epstein's trade secrets in Massachusetts and utilized the information in directing Futuremed, from Massachusetts, to produce the Tigertail for Bard's own purposes. (Epstein's Supplemental Affidavit ¶ 46.)   Thus Bard's plan was conceived and hatched upon the visits of the representatives of Bard to Mr. Epstein's place of business and because of this, Bard's actions in Massachusetts constitute the "pivotal events underlying [the] 93A claim" as these actions constitute the root of the entire scheme.

Further, as Futuremed and the several Defendants have wholly failed to answer any of Mr. Epstein's earnest inquiries, in order to discern what actually transpired, discovery will be needed. Thus in order to fully comprehend the transfer technology under a "center of gravity" and "pivotal events" theories, discovery will be needed in order to discern what really occurred as Futuremed and the other Defendants still fail to come forward with any answers.

As a final inquiry,

[t]he United States Court of Appeals for the First Circuit has adopted a three-
prong balancing test that looks to (1) where the defendant commits the unfair or
deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful

conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct.

*Kuwaiti Danish*, 781 N.E.2d at 798 (citation omitted). Applying the first prong, Bard clearly committed the unfair or deceptive act or practice upon Mr. Epstein in Massachusetts. Applying the second prong, Mr. Epstein received the wrongful conduct in Massachusetts. Applying the final prong, Mr. Epstein sustained losses caused by the wrongful conduct in Massachusetts. Therefore, all three of these prongs end toward the evolutions in Massachusetts and as such the majority of the plan was clearly formulated, initiated and completed in Massachusetts.

Therefore, under the elevated standard for dismissal established in *Rumford Pharmacy*, treating all allegations in the complaint as true and drawing all reasonable inferences therefrom in favor of the Mr. Epstein, the "pivotal events underlying [the] 93A claim" and "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." See *Rumford Pharmacy*, 970 F.2d at 997. Therefore, Futuremed's Motion to Dismiss Count X should be denied and Mr. Epstein's Count X should be stand as pled. If the Court finds that Mr. Epstein has not provided adequate factual predicates to this claim, the Court should grant leave to allow Mr. Epstein to amend his complaint to comply with the standards set forth.

## III.  CONCLUSION

Based upon the aforementioned reasons, Futuremed's Motion to Dismiss should be denied. In the alternative, leave of Court should be granted to allow Epstein to amend his complaint to comply with the standards set forth in Fed. R. Civ. P. 8 and Fed. R. Civ. P. 9 (b).

## IV.  REQUEST FOR ORAL ARGUMENT PURSUANT TO LOCAL RULE 7.1(d)

Plaintiff, Scott M. Epstein requests oral argument on this motion pursuant to Local Rule 7.1(d).

Dated: 2/18/2004

Attorney for Plaintiff

Gary E. Lambert, Esq.
LAMBERT & ASSOCIATES
92 State Street, Suite 200
Boston, MA 02109
Tel. 617-720-0091
Fax 617-227-0313

By:

Gary E. Lambert, Esq.
BBO#: 548,303

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all the

attorneys of record on February 18, 2004 by First Class Mail, Postage Pre-Paid to:


Attorney Michael Albert
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210

Attorney Andrew Good
Good & Cormier
83 Atlantic Avenue
Boston, MA 02110

Attorney Samuel Levy
Wuersch & Gering LLP
11 Hanover Square, 19th Floor
New York, NY 10005


Melissa J. Patangia
for Gary E. Lambert, Esq.