UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SCOTT M. EPSTEIN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) Civil Action No.: 03 CV 12297 (RWZ) <br> ) <br> C.R. BARD, INC., ) <br> FUTUREMED INTERVENTIONAL, INC.,) <br> and CROSSBOW VENTURES, INC. ) <br> ) <br> Defendants. ) | |

**SUPPLEMENTAL AFFIDAVIT OF SCOTT M. EPSTEIN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO C.R. BARD INC.'S, FUTUREMED INTERVENTIONAL, INC.'S, AND CROSSBOW VENTURES, INC.'S MOTIONS TO DISMISS COMPLAINT**

I, Scott M. Epstein, under oath, swear and affirm the following:

1. My name is Scott M. Epstein and I am the Plaintiff in the above-captioned matter.

2. Through my attorney, Gary E. Lambert, I originally filed the above-referenced action in the Business Litigation Session of the Suffolk Superior Court in Massachusetts on October 15, 2003.

3. Subsequently, the above-captioned several defendants moved to remove the case to the United States District Court, District of Massachusetts.

4. Defendants C.R. Bard, Inc., ("Bard"), Futuremed Interventional, Inc., ("Futuremed"), and Crossbow Ventures, Inc., ("Crossbow") have now moved to dismiss the Complaint.

5. I do not consent to Bard's, Futuremed's, or Crossbow's Motions to Dismiss and oppose Bard's, Futuremed's, or Crossbow's Motions to Dismiss the Complaint.

6. I was able to accomplish what Bard had not been able to do successfully without the use of my trade secrets and technology. (Complaint ¶ 10-26).

### My Attempts To Ascertain Information From Bard, Futuremed And Crossbow Regarding Unauthorized Use Of My Intellectual Property

7. As shown in the Complaint, on or about October, 10, 1999, I sent a non-accusatory, non-conclusory letter to Bard in an attempt in to gather information. In a November 10, 1999 letter, Attorney for Bard, M. Banks Neil responded by asserting that **only the physical product specifications belonged to Bard and further admitted that "it is SME's technology and processes used to manufacture a product in conformance with these specifications that may be proprietary to SME."** (See Bard's Memorandum of Law Exhibit "A"; see also attached Exhibits A and B, Mr. Epstein's October 10, 1999 letters and attached Exhibit C, Bard's Response to Mr. Epstein's October 10, 1999 letter).

8. Prior to sending my October, 10, 1999 letter, no one at Bard, Futuremed or Crossbow was communicating with me. (See attached Exhibits A and B).

9. Also, on January 6, 2000, I sent letters to Bard corporate in an attempt to force a better understanding about my position because of BUD's (a division of C.R. Bard) inaction and complete lack or attention to my matters. I essentially was going directly to the top in the hope that my issues would be addressed. (See attached Exhibits D, E and F, Mr. Epstein's January 6, 2000 letters to Bert Mirsky, Attorney Nadia Adler and Attorney M. Banks Neil, respectively).

10. On or about January 26, 2000, I was advised by Bard that they were "unaware of any facts supporting my allegations" and Bard went on to state "we are more than willing to discuss your claims with you." (See Exhibit G, Letter from Attorney M. Banks Neil to Mr. Epstein).

11. In June, 2000, my attorney contacted Bard in response to Bard's January 26, 2000 letter. (See Exhibit H, Letter from Attorney Gary Lambert to M. Banks Neil).

12. The proposed discussions promised by Bard in their January 26, 2000, letter never occurred.

13. On or about August 28, 2000, I again wrote to Bard to appeal for support and help from Nadia C. Adler, then V.P. General Counsel and Secretary at Bard. (See Exhibit I, Letter from Mr. Epstein to Attorney Nadia Adler).

14. As of September of 2000, over ten months after I wrote to Bard, no one at Bard contacted me or answered any of my questions.

15. On or about September 6, 2000, Attorney for Bard, Jack Myers, contacted my attorney and stated he could not locate any files on these matters.

16. On September 11, 2000, my attorney was contacted by Jack Myers at Bard and requested the contact information of four people who provided affidavits on my behalf. Jack Myers stated that he was going to conduct his own investigation.

17. On or about November 11, 2000, I wrote a letter to both the Directors of CrossBow and a letter to the executives at CrossBow to inform them that I was suspicious of Futuremed and its relationship with Bard. I explained to them that I suspected Bard had transferred my technology to Futuremed. (See Exhibit J Letters to CrossBow from Mr. Epstein).

18. CrossBow was thus notified, however, CrossBow never replied to my letters. (Complaint ¶ 42).

19. Because neither CrossBow nor Futuremed even responded to my written inquiry and my allegations, I was without knowledge as to CrossBow's and Futuremed's opinions on the matter or what their intentions were.

20. Thus, Bard's assertion that I was on notice on October 11, 1999 of my causes of action against Bard, Futuremed and CrossBow is false.

21. Since I filed my Complaint on October 15, 2003 against CrossBow and Futuremed, my complaint is timely and properly within the statute of limitations in Massachusetts.

22. On or about December 7, 2000, my attorney was contacted by Jack Myers at Bard who represented that Bard had conducted an extensive investigation into my claims. Further, Jack Myers stated that Bard would forward affidavits disputing my allegations.

23. To date, Bard has never provided me with their so-called affidavits and Bard has never provided me with the results of their so-called investigation.

24. Thus, during all of 2001, no representations were ever made to me by Bard quantifying whether my allegations were taken seriously or just ignored. Bard forwarded no answer whatsoever, only dodging questions and leaving me in the dark.

25. As such, during the year 2001, recognizing that at this point I could not completely prove my reasonable suspicions and also recognizing that I had no way to further research the actions of Bard, I began to believe that there was no recourse. I began to suspect that Bard may have been selling off the remaining inventory of the units that I had sold to them.

26. As a small business person with limited financial and personnel resources, I could not consistently keep up writing the same letters to corporate heads and attorneys at Bard pleading for their assistance. Also, I could not afford to pay to have my

3

attorney consistently trying to get an answer or the results of Bard's so-called investigation into my allegations.

27. However, as stated in the Complaint, I met Bill Appling at the April 2002 SCVIR meeting in Baltimore, and he told me about a meeting he had with Futuremed where he saw my Tigertail at Futuremed. Completely unknowing as to whether I had any relationship with Futuremed, Bill asked me if I knew about these occurrences.

28. It became clear to me after my encounter with Bill Appling, that Bard was hiding something from me and had not been dealing honestly with me.

29. In April 2003, Mr. Howard Klymas attended the American Urological Association ("AUA") Annual Congress held in Chicago, Illinois. He reported to me, after attending, that he viewed a catheter put on display by Bard that looked very much like the Tigertail that I had created for Bard. (Affidavit of Howard Klymas in Support of Plaintiff's Complaint ¶ 11-22).

**My Rights In My Trade Secrets**

30. I have always owned and controlled my intellectual property and trade secrets.

31. I have always owned and controlled my intellectual property and trade secrets that I created and developed during my work as both SME ("SME") and Medical Device Labs, Inc. ("MDL").

32. The SME and MDL businesses were developed, owned, and operated by me during all times relevant to this action.

33. I solicited business, entered into contracts and conducted business for both SME and subsequently MDL during all the relevant times.

34. During the periods of incorporation, I was the President, Treasurer and Director of MDL. I was also the owner and proprietor of SME at all applicable times. (See Exhibit K, Articles of Incorporation for MDL)

35. I have **never** assigned any of my intellectual property or trade secrets to either SME or MDL.

**Bard's Pursuit Of My Trade Secrets In Massachusetts**

36. In commencing a relationship with me regarding my trade secrets, Bard came to me and asked for my assistance because they could not produce a product with the quality and durability of the products which I was producing.

4

37. Bard and BUD representatives frequently made visits to my place of business located in Massachusetts to inspect, view and copy my trade secrets and technology.

38. Mr. Xavier Sarabia, then working for Bard, visited my place of business several times, viewed and inspected many times proprietary information and processes, specifically but not limited to January 1995, August 1995, February 1997.

39. Mr. Jeffrey Fecho, then working for Bard visited my place of business in Massachusetts several times, viewed and inspected proprietary information and processes on or about March 20-21, 1996.

40. Mr. Mark Hielman, then working for Bard visited my place of business several times, viewed and inspected, many times, proprietary information and processes.

41. Mr. Howard Klymas, then working for Bard, visited my place of business several times, viewed and inspected, many times, proprietary information and processes. Subsequently Mr. Klymas was transferred to a Bard facility in Billerica, Massachusetts, which allowed him make frequent visits to my place of business.

42. Bard agreed to enter into non-disclosure agreements pertaining to my trade secrets and technology while physically present in the Commonwealth of Massachusetts.

43. During said visits to my place of business in Massachusetts, Bard was allowed to view the manufacturing processes involved in making the Tiger Tail catheters.

44. During said visits to my place of business in Massachusetts, Bard was allowed to inspect and copy documents and did inspect and copy documents pertaining to my proprietary trade secrets and technology.

45. As a result of the above-referenced visits by Bard to my place of business in Massachusetts, many of my documents were shared, configured and exchanged with Bard while all parties were in Massachusetts.

46. My proprietary documentation and process information was then taken from my place of business and transferred to the various Bard project teams, including but not limited to engineering, manufacturing, quality assurance, quality control and regulatory affairs, for use by Bard.

47. Bard took all of the proprietary information situated in Massachusetts to Bard, allegedly to prove my results.

48. However, Bard began to immediately cut purchase orders for lots of different sizes of catheters and requested various quantities be produced simultaneously. Bard was so eager that they rushed me into production without adequate pilot production runs for the different catheters.

49. Thus, Bard viewed my proprietary trade secrets and technology in Massachusetts and utilized this information in directing Futuremed, from Massachusetts, to produce the Tigertail for Bard's own purposes.

50. It was represented to me by representatives of Bard that my proprietary trade secrets and technology remedied the design and manufacturing problems that Bard encountered.

51. Bard representatives also disclosed to me that, before viewing my proprietary trade secrets and technology, Bard had abandoned all efforts at perfecting and producing products exhibiting the properties existing in products developed using my proprietary trade secrets and technology.

**Misappropriation Of My Trade Secrets By Bard, Futuremed and Crossbow In Massachusetts And The Misrepresentations Made To Me.**

52. Therefore, the misappropriation of my inventions, proprietary trade secrets and technology took place in Massachusetts.

53. Bard took my proprietary trade secrets and technology from me in Massachusetts with the intent to misappropriate said secrets and technology for their own benefit and the benefit of Futuremed and CrossBow.

54. It was not until I was informed in 2002 and again in 2003 by those working in the field of medical devices that I was able to realize that there was an ongoing misappropriation, both negligently and intentionally by Bard, Futuremed and CrossBow.

55. I did not become aware of the misappropriations by Bard and the several defendants until I spoke to Mr. William Appling while attending the SCVIR Conference in April, 2002, and he stated that he saw the Tigertail being manufactured and offered for sale by Futuremed in 2001.

56. The trade secrets and technology in dispute belong to me and always have belonged to me.

57. At the time of my disclosure of my trade secrets and technology to Bard in Massachusetts, I did not suspect Bard was going to misappropriate my trade secrets and technology from Massachusetts to Futuremed and CrossBow.

58. I did not learn of the full extent of the misappropriation of my trade secrets and technology until I personally observed one of Bard's catheter products on display and offered for sale at the AUA tradeshow in Chicago in 2003. (Affidavit of Epstein in Support of Complaint ¶ 22-28).

59. Regarding fraudulent or misrepresenting statements, due to the lack of cooperation by Bard and the other Defendants, I have still yet to ascertain the complete list of names of individuals, the true content of the statements made, and where or when the statements were made to such entities as government agencies. However, any representation by any of the Defendants regarding my trade secrets and technology, both negligently and intentionally, must be fraudulent as I never gave any one the right to file my trade secrets with the FDA or any other government agency.

60. I believe to the best of his knowledge that the misrepresentations regarding my trade secrets and technology were made by Bard.

61. My claims for Misrepresentation, Negligent Misrepresentation and Fraudulent Concealment are based on personal knowledge.

62. I have described the time, place and content of Bard's misrepresentations.

63. Misrepresentations made by Bard, Futuremed and CrossBow have occurred and still do occur to my detriment and have caused me substantial damages.

**Finalization Of Information Leading To Filing Of The Complaint**

64. As shown above, while attending the SCVIR Conference in April, 2002, I was advised by Mr. William Appling that he saw the Tigertail being used and offered for sale by Futuremed in 2001.

65. In addition, my claims are based on the personal knowledge of a witnesses who provided a sworn affidavit attached to my Complaint. (Affidavit of Howard Klymas in Support of Plaintiff's Complaint).

66. Mr. Klymas has recounted the time, place and content of the misrepresentations made by Bard to the public and potential customers. (Affidavit of Howard Klymas in Support of Plaintiff's Complaint).

67. I was witness to these misrepresentations while attending the American Urological Association Conference in 2003 in that Bard was selling catheters reaching specifications that only my trade secrets could achieve. (Affidavit of Plaintiff in Support of Complaint ¶'s 22-28).

68. Each and every paragraph and count to my complaint contains claims upon which relief may be granted by the Court.

69. I dispute the allegation in Bard's Memorandum, at page 5 that "Over four years before [I] filed the lawsuit, [I] was on notice of same alleged injuries animating [my] tort and 93A claims." Although in 2002 Bill Appling informed me of Futuremed's activities regarding possible theft of my trade secrets, I was not on

7

notice with complete knowledge until at least 2003. By midway through 2003, I was able to verify the information first hand regarding how Bard, Futuremed and Crossbow had misappropriated my trade secrets and technology. Also, I have yet to realize the full nature and extent of injuries caused me by Bard, Futuremed and Crossbow.

70. My proprietary processes were and are novel and I was successful in obtaining the requested objectives for Bard.

71. I never gave Bard either express or implied permission to share my proprietary processes with third parties.

72. Bard's sharing of my proprietary processes with Futuremed was done without my knowledge.

73. I believe that Bard is sharing my proprietary process, trade secrets and technology with third parties such as Futuremed and CrossBow.

74. The letters written by me and addressed to Bard in 1999 and 2000 were mere inquiries of Bard in order obtain information about whether or not they were using my trade secrets and technology without my permission.

75. I did not make "attempts to squeeze a cash settlement out of Bard." Such statements are unfounded and untruthful.

76. My October 10, 1999 letter does not accuse Bard of selling the Tigertail product after I stopped manufacturing it, however, Bard admits to do doing so (Memorandum of Law in Support of Motion to Dismiss).

77. Since the Tigertail utilized my trade secrets and technology, Bard should have obtained my permission to outsource the manufacturing of the Tigertail.

78. Bard relied upon and used my documents and documentation to misrepresent to the FDA a cycle of evolution for the Tigertail. (Complaint ¶ 48).

79. I invested a lot of time and money to make significant changes to my lab and facilities to accommodate the needs and requirements of Bard. I made changes to my production line to increase the capacity of my product development. I hired, trained and paid for additional workers. My existing workers required additional training. I formalized and expanded quality assurance and quality control. I invested money in acquiring new hardware, electronics, computers, furniture. I further increased the level of security in my lab and facilities and expanded storage facilities to accommodate Bard. I also exclusively focused on manufacturing for Bard, to the detriment of my other existing clients.

80. Bard's, Futuremed's and Crossbow's actions have ruined any opportunity I might have had of utilizing my trade secrets for monetary gain throughout the catheter industry as they have flooded the industry with catheters manufactured using my methods. Thus these Defendants have taken away the novelty of my trade secrets by selling the catheters as an individual apparatus and as part of a kit and publicizing the product of my trade secrets in an industry wide fashion.

81. Such misrepresentations allowed Bard to misappropriate my trade secrets and technology without my knowledge or permission for the benefit of Bard, Futuremed, CrossBow and likely other third parties.

82. Thus, due to the facts I have stated above, the motions to dismiss my Complaint filed by Bard, Futuremed, CrossBow should be denied. Further, I request that if this Court needs more particular information, the Court grant me leave to allow me to amend the Complaint.

AFFIANT FURTHER SAYETH NOT.

_____
Mr. Scott M. Epstein

Sworn to before me in _BOSTON, MASSACHUSETTS_ on this _17TH_ day of February, 2004.

_____
Notary Public
MICHAEL M. RUBINO
MY COMMISSION EXPIRES
MAY, 19, 2006